Opinion by Judge BERZON; Dissent by Judge TASHIMA.
*880 OPINION
BERZON, Circuit Judge:
Hamid Hayat, born in California in September 1983 and raised largely in Pakistan, was convicted of providing material support to terrorists, in violation of 18 U.S.C. § 2339A, and of making false statements to government officials, in violation of 18 U.S.C. § 1001. The terrorism statute criminalizes providing “material support or resources” to terrorists. The prosecution’s case was that Hayat violated the statute by providing his services to terrorists when he attended a terrorist training camp in Pakistan and returned to this country to await orders to carry out a terrorist attack. The jury found him guilty of that conduct. No party has questioned the applicability of the statute to such conduct.
Hayat appeals on three bases: First, he maintains that he was denied a fair trial because the jury’s foreperson was biased against him. Second, he asserts that the district court imposed an unconstitutional limitation on his cross-examination of the government’s key witness. Third, he contends that the district court erred in admitting expert testimony offered by the government and excluding expert testimony offered by the defense. Additionally, Hayat asks us to review the district court’s dismissal without prejudice of his motion to vacate his convictions under 28 U.S.C. § 2255.
We affirm the judgment of the district court. We dismiss for lack of jurisdiction the appeal of the dismissal of the § 2255 motion. The district court correctly dismissed the motion without prejudice to the filing of a § 2255 petition when this appeal is final.
I.
Hamid Hayat is a U.S. citizen of Pakistani descent. He lived in the United States until he was seven and then, between the ages of seven and eighteen, with his grandparents in Pakistan. Hayat returned to the United States in 2000 to live with his parents in Lodi, California. Three years later, in April 2003, he traveled to Pakistan with his family. He spent just over two years in Pakistan on this second stay, returning to the United States in late May 2005. Days after his return, Hayat was arrested by FBI agents and charged with providing material support to terrorists and making false statements to government officials. The events giving rise to Hayat’s arrest are as follows:
In October 2001, FBI agents in Oregon interviewed Naseem Khan, a 28-year-old Pakistani immigrant, in connection with a money laundering investigation. Khan informed the agents that he had regularly observed Ayman al Zawahiri, Osama bin Laden’s second-in-command and one of the FBI’s 22 most-wanted terrorists, at a mosque in Lodi, California, in 1999. Khan later told the agents that he had also seen two other individuals on the FBI’s 22 most-wanted list in Lodi during the same period.[1]
The FBI then hired Khan as a confidential informant and asked him to return to Lodi to gather additional information on a suspected terrorist cell. Khan agreed. He began his work as an informant in Lodi in December 2001.[2] Approximately eight *881 months later, in August 2002, Khan met Hayat, who was nineteen years old at the time and living in his parents’ garage. As explained in greater detail below, recorded conversations between Khan and Hayat indicated that Hayat’s father was linked to a terrorist organization in Pakistan and that Hayat’s uncle and grandfather were recruiters for “jihad.”[3]
Between August 2002 and October 2003 Khan and Hayat spoke regularly. Khan recorded seven of these conversations, took notes on others, and reported to the FBI soon after every conversation with Hayat, summarizing for the agents those conversations that were not recorded. The recorded conversations were introduced at trial, as was testimony by Khan regarding unrecorded conversations. Because Khan and Hayat frequently spoke to each other in Pashto and Urdu, the jurors were provided with English translations of the pertinent parts of the recorded conversations.
In the recorded conversations, Hayat made several anti-American and anti-Semitic remarks. At one point, for example, he expressed pleasure over the murder of Wall Street Journal reporter Daniel Pearl because his death meant that “[n]ow they can’t send one Jewish person to Pakistan.” In addition, Hayat at times spoke approvingly of Islamic fundamentalist groups such as Jaish-e-Mohammed and indicated his respect for their leaders. He also professed to know and to admire Pakistanis who had engaged in “jihad.” Some of these people Hayat knew because they had studied in a madrassah, or religious school, in Pakistan run by his grandfather, which Hayat had also attended. Hayat told Khan that his grandfather was a prominent cleric and that after 9/11, Pakistani President Musharraf had sent him and others to Afghanistan to persuade the Taliban to hand over Osama bin Laden. Ha-yat also described to Khan a terrorist training camp in Pakistan — he said he had seen a video of it — and, on a few occasions, expressed interest in attending such a camp.
Five of the recorded conversations took place while Hayat and Khan were both in Lodi. At one point, when the two were discussing travel to Pakistan and a possible meeting with Hayat’s uncle, Hayat said “I have one objective now. If I went to Pakistan, now, see, straight away, I’ll stay at home for one or two weeks, then I’m going for training, friend.” (Underlined portion spoken in English).
Hayat traveled with his family to Pakistan in April 2003. Two of the recorded conversations took place when he was there. Like the earlier conversations, they covered a wide range of topics. On one occasion, Khan scolded Hayat for being lazy and not going to a training camp. In response, Hayat protested that the camp was closed during hot weather and that had the camp been open, he “would have been there.” On another occasion, Khan relayed to Hayat a conversation in which Hayat’s father explained that “[Hayat wi]ll enter the Madrassah, and, God Willing, he [will] go for training!” Hayat responded to Khan: “Um-hmm_No problem, absolutely.” (Underlined portion spoken in English).
*882 In another of the recorded conversations, Hayat explained to Khan how to send money to Sipah-e-Sahaba (“SSP”), a Pakistani organization that Pakistan declared a terrorist organization in 2002. During a conversation with Khan, Hayat expressed admiration for members of SSP who die as “martyrs.” Hayat boasted that he gave more money to SSP than any other member of his Pakistani madrassah, and stated that he gave money to SSP because his money was more likely to be used to acquire “weapons, books and everything” than if he gave to other groups, which wasted money. (Underlined portion spoken in English). Hayat also reported that when someone told him that he could go to jail for giving SSP money, he replied, “Fuck you. Who cares, man, who goes to jail, man? .... Fuck, look what’s America doing....” (Underlined portion spoken in English).
Hayat made several statements to Khan indicating Hayat’s knowledge of his family’s involvement in terrorist activities. For example, Hayat explained that his father in Lodi had sent money to SSP. Ha-yat also told Khan that his grandfather, who was the leader of the madrassah Ha-yat attended in Pakistan, had called a special meeting in 1999 where he recommended that his students leave the ma-drassah to go participate in jihad. In addition, Hayat explained that if someone were interested in attending a training camp, that person could contact Hayat’s maternal uncle, who would either accompany that person “to the Jehad people’s office,” or make a phone call to that office on the interested person’s behalf.
Hayat’s direct interactions with American law enforcement began when he attempted to reenter the United States in May 2005. On May 30, 2005, Hayat’s return flight to San Francisco was diverted to Japan because Hayat’s name appeared on the federal government’s “No Fly” list.[4] Hayat was interviewed in Japan by FBI agent Lawrence Futa. Futa questioned Hayat about his two-year stay in Pakistan, including whether Hayat had joined a terrorist organization or attended a terrorist training camp. Hayat denied joining a terrorist group or attending a training camp while in Pakistan. Futa concluded that Hayat “posed [no] immediate threat” and could be permitted to return to the United States. Hayat left Japan and flew to San Francisco that same evening.
Four days later, on June 3, 2005, FBI agents Tenoch Aguilar and Sean Wells interviewed Hayat at his parents’ home in Lodi. After again explaining the reason for his family’s trip to Pakistan — because of his mother’s health — and his activities while in Pakistan, Hayat again denied having attended a terrorist training camp and stated that “he would never be involved with anything related to terrorism, and didn’t know why anybody would say otherwise.” After eliciting this response, Aguilar and Wells asked Hayat to come to the FBI office in Sacramento for further questioning.
Hayat arrived at the FBI office in Sacramento around 11 a.m. the following morning and was interviewed in four waves. Hayat at first denied having attended a terrorist training camp, but during the second session admitted that he had attended a camp for a few days during an earlier stay in Pakistan in 2000, where he “observed and heard weapons training,” and also in 2003, when he himself received “pistol training” at a camp in “Balakot.”
The third and fourth sessions, which were videotaped, took place during the *883 afternoon and evening of June 4, 2005, and the early morning hours of June 5. During the third interview, Hayat confirmed that he had attended a camp to train for jihad and said he was trained to use a pistol and rifle and taught how to kill American troops.
Before the final session, Hayat was given Miranda warnings (for the second time that day) and signed an Advice of Rights form (also for the second time). Hayat reported that at the training camp, he was told to expect to receive orders in the United States. When someone wanted to transmit orders to him, the person would first contact Adil Khan (a prominent Islamic figure in the Lodi, California area); Khan would contact Shabbir Ahmed (the Imam at Hayat’s Lodi mosque); and Shab-bir would contact Hayat. Also, by the end of the interview Hayat had suggested that his grandfather was involved in jihadist activities, indicating that his grandfather may have held a leadership position in the terrorist camp Hayat attended.
The FBI arrested Hayat at the end of this set of interviews.
On January 26, 2006, the government filed a second superseding indictment against Hayat, charging him with one count of violating 18 U.S.C. § 2339A (providing material support to terrorists) and three counts of violating 18 U.S.C. § 1001 (making false statements to the FBI). Section 2339A reads, in relevant part,
Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [various provisions prescribing penalties for terrorist acts] ... shall be ... imprisoned not more than 15 years....
18 U.S.C. § 2339A(a). The statute defines “material support or resources” as “any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.” Id. § 2339A(b)(1). The prosecution’s case was that Hayat had provided his personal services to a terrorist organization by attending the training camps in Pakistan and returning with the intent to carry out acts of terrorism when directed to do so. The three counts of making false statements to the FBI were related to Hayat’s initial statements to various FBI agents in California, in which he denied attending a terrorist training camp while in Pakistan.
Hayat’s trial began on February 14, 2006. In addition to the seven recorded conversations between Hayat and Khan, the government presented Khan’s testimony about those conversations and Hayat’s confessions to the FBI. The jury viewed the videotaped confessions, and several agents, including Futa, Aguilar, and Sweeney, testified about their interviews with Hayat. The government also introduced a “scrapbook” that agents had seized from Hayat’s parents’ garage, where Hayat was living. The scrapbook bore Hayat’s name on the cover and contained clippings from Pakistani newspapers. Several of the articles in the scrapbook discussed Islamic fundamentalist groups, including the Taliban, and their leaders, including Osama bin Laden. Khan testified that Hayat had shown him the scrapbook while expressing support for the fundamentalist groups described in the articles.
The government’s evidence also included a note written in Arabic that government *884 agents had found in Hayat’s wallet after his return from Pakistan. Khaleel Mohammed, an expert in Islamic studies who testified as an expert witness for the government, testified that the note was an Islamic supplication. He provided the following translation of the Arabic phrase: “Oh Allah we place you at their throats and we seek refuge in you from their evils.” Mohammed opined that the supplication was both uncommon and “not peaceful,” and that the type of person who would carry such a supplication was “[a] person who perceives him or herself as being engaged in war for God against an enemy.”
Finally, the government presented testimony from two additional experts, Hassan Abbas and Eric Benn. Abbas, an expert on extremist groups, testified to the location and nature of typical terrorist training camps in Pakistan. Benn, a satellite imagery expert who had analyzed satellite images to determine the likelihood that there was a militant training camp near Balakot between 2003 and 2005, characterized the likelihood as “a good strong possible.” He further testified that when an analysis of the satellite imagery was combined with the description Hayat had provided in his confession about his travel to the camp, his assessment of the likelihood that a military training camp existed outside Balakot increased to “probable.”
Hayat did not testify. He presented an expert, Anita Weiss, who testified that it is common for Pakistanis to carry a talismanic prayer, known as a ta’wiz, for protection while traveling. The district court did not permit Ms. Weiss to express her opinion on whether the note found in Hayat’s wallet was a ta’wiz because Weiss does not speak or read Arabic.
Hayat also presented testimony from eleven other witnesses — mostly FBI agents — and from Naseem Khan, who had also testified for the prosecution. One aspect of Hayat’s defense was that Khan was an unreliable informant who had given the FBI implausible information — namely a report that three A1 Qaeda members on the FBI’s most wanted list had visited a mosque in Lodi — the accuracy of which the FBI was unable to confirm, and which was belied by testimony from a regular attendee of the Lodi mosque who never saw the men. Hayat’s counsel also elicited testimony from Gary Schaaf, one of the agents who interviewed Hayat, that Schaaf and other agents used leading questions and that Hayat seemed tired during the interview. In addition, agent Terry Rankhorn testified that he had posed undercover as a convert to Islam and met with Hayat four times in 2002; Hayat never mentioned training camps to Rankhorn.
Jury deliberations began on April 12, 2005. On April 25, 2005, after nine days of deliberation, the jury returned a verdict of guilty on all four counts charged in the indictment. Hayat filed a motion for a new trial based on juror misconduct and, later, a second motion for a new trial that specified thirteen additional grounds for granting a new trial.
After conducting an evidentiary hearing related to the juror misconduct charge, the district court denied Hayat’s motions for a new trial. Hayat was sentenced to 288 months — 24 years — in federal prison. That sentence included the maximum, 15-year penalty for violation of 18 U.S.C. § 2339A. After sentencing, Hayat filed a motion to vacate his convictions under 28 U.S.C. § 2255. The district court dismissed the motion without prejudice.
Hayat timely appealed his convictions but did not file a notice of appeal from the district court’s later dismissal of his § 2255 motion.
II.
As noted, Hayat raises three challenges to his conviction. First, he maintains that *885 he was denied a fair trial because the jury’s foreperson, Joseph Cote, was biased against him. Second, he asserts that the district court imposed an unconstitutional limitation on his cross-examination of the government’s key witness, Naseem Khan. Finally, he contends that the district court erred in admitting expert testimony offered by the government and excluding expert testimony offered by the defense.
A.
Hayat argues that he is entitled to a new trial because the jury foreperson, Joseph Cote, harbored actual bias against Hayat. Hayat offers four facts as evidence of Cote’s bias: (1) alleged racial and religious remarks made by Cote during deliberations; (2) post-trial statements attributed to Cote in an Atlantic Monthly article; (3) Cote’s improper contact with alternate juror W. during deliberations; and (4) comments made by Cote during deliberations in which he indicated that he had overheard media reports about the trial.
We review the denial of a motion for a new trial based on assertions of juror bias for abuse of discretion. United States v. Smith, 424 F.3d 992, 1011 (9th Cir.2005).[5] We review for clear error the district court’s factual findings, United States v. Lopez-Martinez, 543 F.3d 509, 517 (9th Cir.2008), including the determination of whether a juror is actually biased, see Estrada v. Scribner, 512 F.3d 1227, 1240 (9th Cir.2008). “The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.” Dyer v. Calderon, 151 F.3d 970, 973 n. 2 (9th Cir.1998) (en banc).
“The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors. The bias of even a single juror would violate [Hayat’s] right to a fair trial.” Estrada, 512 F.3d at 1239 (internal quotation marks and alterations omitted). “Actual bias is, in essence, bias in fact — the existence of a state of mind that leads to an inference that the person will not act with entire impartiality.” Id. at 1240 (internal quotation marks omitted). If Hayat can show that Cote “ ‘failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause,’ then [Hayat] is entitled to a new trial.” Id. (quoting United States v. Henley, 238 F.3d 1111, 1121 (9th Cir.2001)). “The central inquiry in determining whether a juror should be removed for cause is whether that juror holds a particular belief or opinion that will ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ ” United States v. Padilla-Mendoza, 157 F.3d 730, 733 (9th Cir.1998) (quoting Wainwright v. Witt, 469 U.S. 412, 433, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)).
As evidence of Cote’s bias, Hayat alleges, first, that Cote made “several inappropriate racial and religious comments during deliberations.” Hayat presented evidence from Jurors L. and B., as well as from Juror H. via an affidavit by Ha-yat’s private investigator, that Cote made a “racial” comment during deliberations. B. declared that “[d]uring the deliberation process, ... Cote[ ] made the statement they all looked the same when wearing a costume or when put in a costume. I believe Mr. Cote made this *886 statement in connection with a discussion of witness Naseem Khan’s claim that he had seen Ayman al-Zawahiri in Lodi.” Similarly, L. stated that “[djuring deliberations Mr. Cote made racial slurs. As an example, on one occasion ... he said in front of the entire group that they all look alike.... [i]f you put them in the same costume.” H. reported to Hayat’s investigator essentially the same comment by Cote, “that when they dress alike they all look the same.” B. also stated more generally that “[tjhroughout the deliberation process, Mr. Cote made other inappropriate racial comments,” but, aside from the “look alike” remark, did not say what any of them were.
Generally, the Federal Rules of Evidence forbid courts from inquiring into what went on during jury deliberations. See Fed.R.Evid. 606(b).[6] We have not decided, as some courts have, whether Rule 606(b) prevents us from considering evidence that a juror’s racial bias was expressed during deliberations. See Henley, 238 F.3d at 1120-21; compare, e.g., United, States v. Villar, 586 F.3d 76, 84, 87 (1st Cir.2009) (holding that Rule 606(b) “precludes any inquiry into the validity of the verdict based on juror testimony regarding racial or ethnic comments made during the course of deliberations,” but that “the rule against juror impeachment cannot be applied so inflexibly as to bar juror testimony in those rare and grave cases where claims of racial or ethnic bias during jury deliberations implicate a defendant’s right to due process and an impartial jury” (internal quotation marks omitted)), with United States v. Benally, 546 F.3d 1230, 1236-39 (10th Cir.2008) (holding that Rule 606(b) contains no exception for racially biased statements made during jury deliberations and expressing skepticism about whether constitutional concerns can ever override the rule). Where, however, “a juror has been asked direct questions about racial bias during voir dire, and has sworn that racial bias would play no part in his deliberations, evidence of that juror’s alleged racial bias is indisputably admissible for the purpose of determining whether the juror’s responses were truthful.” Henley, 238 F.3d at 1121 (citing Hard v. Burlington N. R.R., 812 F.2d 482, 485 (9th Cir.1987)).
During voir dire, Cote was asked whether he had, or had ever had, “any experiences, feelings or impressions about Muslims, Pakistanis, Pakistani-Americans or Islamic beliefs that would make it difficult for [him] to be a fair and impartial juror.” He responded that he had “no impressions, pre-conditions or feelings about being impartial in this case.” We may consider Cote’s statement that “they all look alike” *887 when “in a costume” for the purpose of determining whether this response was truthful.
We cannot say that the district court clearly erred in concluding that Cote’s statement did not indicate an actual racial, ethnic, or religious bias. Cote did not specifically refer to race, religion, or ethnicity in making the statement, but to “they” who wear certain clothing common among Pakistanis and other Muslims. The district court reasoned that the context in which Cote’s statement was made provided a nonbiased explanation for his comment: Cote was attempting to explain how Naseem Khan, the government’s key witness, could have mistakenly but in good faith informed FBI agents that he had observed al-Zawahiri, an Egyptian, in Lodi, California.
Cote’s statement could be interpreted as reflecting a tendency to group people together on the basis of their shared cultural or physical characteristics, while ignoring or failing to perceive the differences that define them as individuals. Statements evincing an inability or unwillingness to differentiate between members of a group are in some contexts quite problematic. See Tobias v. Smith, 468 F.Supp. 1287, 1289-91 (W.D.N.Y.1979) (granting an evi-dentiary hearing where the jury foreperson allegedly said during deliberations that it did not matter that witnesses were unable to identify a photograph of the defendant because “[y]ou can’t tell one black from another” and “[t]hey all look alike”). Nonetheless, Cote’s statement was not specific as to the group referred to; ascribed no negative behavioral characteristics to Egyptians, Pakistanis, or Muslims; and conveyed no overt prejudice against those groups, focusing instead, whether accurately or not, on the nature of clothing sometimes worn by members of those groups, as obscuring individual identity. Compare Henley, 238 F.3d at 1113-14 (remanding for additional findings where one juror reportedly told two others that “[a]ll the niggers should hang” or “[njiggers are guilty”). We conclude that the district court did not clearly err in finding that the “look alike” statement was insufficient to show that Cote lied during voir dire about his lack of racial, ethnic, or religious bias. As to L.’s and B.’s assertions that Cote made “other inappropriate racial comments,” these statements are simply too vague to support a finding that Cote was impermissibly biased. See Fields v. Woodford, 315 F.3d 1062, 1062-63 (9th Cir.2002).
Second, Hayat asserts that other evidence of Cote’s lack of impartiality and his ethnic and religious bias comes from statements he made in a post-verdict interview published in the Atlantic Monthly magazine. Cote stated in the interview:
[There are] so-called new rules of engagement, and I don’t want to see the government lose its case.... Can we, on the basis of what we know, put this kid on the street? On the basis of what we know of how people of his background have acted in the past? The answer is no.
Amy Waldman, Prophetic Justice, The Atlantic Monthly, Oct. 2006, at 82, 93, available at http://www.theatlantic.com/magazine/archive/2006/10/prophetic-justice/5234/. The article also contained the following description of Cote’s views of the government’s approach to the case:
This preventive approach, Cote said, means that “just as there are people in prison who never committed the crime, this may also happen. Not this particular case, I’m saying, but future cases.” He argued that it was “absolutely” better to run the risk of convicting an innocent man than to let a guilty one go. “Too many lives are changed” by terrorism, he said. “So shall one man pay to *888 save fifty? It’s not a debatable question.”
Id. Hayat maintains that these statements demonstrate that Cote “harbored a general bias against Muslims and Pakistanis” and that Cote was willing “to engage in impermissible preventative conviction.”
The district court conducted an eviden-tiary hearing at which it questioned Cote about these comments. To avoid Rule 606(b) issues, the court did not ask Cote whether he made the statements.[7] Rather, the court said, “Assume for the sake of responding to the question I will ask you that you made these statements. Did you have those thoughts at any time prior to the commencement of jury deliberations?” Cote responded, “Definitely not.” Finding that “Cote’s testimony [at the evidentiary hearing] was credible,” the district court concluded:
Even assuming Cote made all of the statements in the Atlantic Monthly article, when read as a whole, the article reveals that the jurors, and Cote himself, thoroughly and thoughtfully deliberated regarding Hayat’s guilt or innocence. The statements in the article do not reveal that Cote had a racial or religious bias against Hayat, that he was dishonest during voir dire, or that he was an unfair or impartial [sic] juror.
(Footnote omitted.)
As an initial matter, the district court did not clearly err in concluding that Cote’s comment about “people of [Hayat’s] background” is not sufficient standing alone to prove that Cote was actually biased against Muslims or Pakistanis. Although Cote might have been referring to young Muslims or Pakistani males in general when he used the phrase “people of [Hayat’s] background,” given that he made the statement after hearing all of the government’s evidence against Hayat, he could well instead have meant people who have expressed anti-American views and attended terrorist training camps. The district court did not clearly err in its assessment of the statement.
Cote is also quoted in the Atlantic Monthly article as stating that, due to the “new rules of engagement,” it was “absolutely better to run the risk of convicting an innocent man than to let a guilty one go” free. These statements can be read to suggest that Cote applied something less than a “reasonable doubt” standard in deciding Hayat’s case. But Cote also specified that he was not referencing “this particular case” in his remarks, and the remarks did not focus in any way on Muslims or Pakistanis in general. So the “rules of engagement” remarks were at best tangentially relevant to whether Cote dishonestly answered the bias questions during voir dire or was biased against Hayat during trial and deliberation.
Moreover, in context, the remarks can be read as a comment not on the burden of proof but on the material support statute and the government’s “preventative approach” legal theory under that statute, which permits the conviction of potential terrorists who may never in fact have committed any terrorist act if not arrested and convicted. In fact, the Atlantic Monthly article overall is devoted to discussing preventative criminal prosecutions of this kind, providing contextual support to an inference that Cote was commenting on such prosecutions, not on the burden of proof.[8]
*889 We are mindful of the strong deference we owe the district court’s credibility findings. See McClure v. Thompson, 323 F.3d 1233, 1241 (9th Cir.2003). Particularly given that deference, as well as the consideration that the issue was Cote’s impartiality as a juror at the time of the trial and not his post-trial attitudes, the non-biased explanations for Cote’s statements, in context, are plausible. We therefore cannot say that the district court clearly erred in crediting Cote’s denial of bias against Ha-yat during the trial and deliberation.
Finally, Hayat points to two instances of juror misconduct as evidence of Cote’s bias. In his motion for a new trial, Hayat argued that Cote committed acts of misconduct that prejudiced the outcome of the trial. The district court held that even if there was misconduct, it was not prejudicial to Hayat.[9] Hayat does not challenge that determination on appeal. Instead, he argues that Cote’s misconduct, in combination with the statements discussed above, evidences his actual bias against Hayat.[10]
First, Hayat maintains that Cote engaged in intentional misconduct during deliberations when, in violation of the court’s express instructions, he contacted alternate juror W., who had been dismissed from the jury when the jury retired. Ha-yat’s private investigator submitted an affidavit declaring that W. described the incident as follows:
Joe Cote called me ... on April [20,] 2006 and left a voicemail message asking me to call him. I returned the call a few minutes later. When Joe answered, I asked him if the trial was over. He said no, he just wanted to ask me about a remark I had made predicting that the jury would have a difficult time during deliberations.... [H]e said I had indicated, with a nod of my head, someone sitting to my left (at the table in the jury room). I said, “Oh, [L.].” Joe said [L.] was no problem; she was a very deep thinker. He said he thought I had been referring to [B.], and that she had been causing a lot of trouble. I expressed surprise, and Joe said he, too, was surprised by her actions. He asked if I had heard anything specific that prompted the remark about [L.]. I said no, it was just my perception. I told Joe the alternate jurors had been instructed not to speak to the jurors until the trial was over. At that point, we concluded the conversation.[11]
Hayat maintains that Cote’s willingness to disregard the court’s orders and seek advice from W. about “problem” jurors is evidence of his bias. He points to United States v. Vartanian, 476 F.3d 1095 (9th Cir.2007), in which we held that the district court did not abuse its discretion in dismissing a juror who had committed misconduct. In Vartanian, the juror in question had spoken to members of the defendant’s family, defense counsel, and the defendant himself during the course of the trial; when questioned about these contacts by the district court, she denied and minimized them. Id. at 1098-99. The district court dismissed the juror because it was “unwilling to trust [her] to be a fair *890 and impartial juror.” Id. at 1097. We affirmed the defendant’s conviction, holding that it was within the district court’s discretion to dismiss the juror “because of her misconduct.” Id. at 1099. We did not express any opinion as to whether the juror’s behavior established that she was biased.
Even if we had concluded that the Vartanian juror’s misconduct was evidence of bias, Cote’s phone call to alternate juror W. differs in a critical regard. In Vartanian, the juror’s misconduct was first reported to the district court on the second day of deliberations, but the misconduct was apparently ongoing throughout the trial. Here, in contrast, Cote did not contact W. until after deliberations had begun. Although Cote obviously committed misconduct in contacting W. to learn about “problem” jurors, his calling W. does not show that he prejudged the case. At most, it suggests that Cote was determined to convict Hayat after viewing all the evidence and the parties’ closing arguments. Nor did Cote make any comments to W. suggestive of racial, ethnic, or religious bias. In short, although we assuredly do not condone Cote’s conduct, once again we cannot say that the district court clearly erred in finding that it did not evidence actual bias.
Finally, Hayat contends that Cote’s comments, during deliberations, about media coverage of the trial also demonstrate his bias against Hayat. Hayat offered evidence, again from Jurors L. and B., that Cote had made references to media reports. B. stated,
At one point during deliberations, Mr. Cote began to discuss something he had learned from media reports about Mr. Hayat’s attorney, Wazhma Mojaddidi. Other jurors and I told Mr. Cote that he should not be reading or listening to media reports of the trial, and that he should not be discussing such reports with fellow jurors.
L. provided a similar report, adding that “Mr. Cote explained that his wife had the TV on in the room next door and he happened to hear about the story by accident.”
Assuming, as the district court did, that the evidence provided by Jurors L. and B. is accurate, Cote committed misconduct by sharing with the other jurors something he had overheard in a media report. Once again, however, this misconduct occurred during deliberations and does not show that Cote prejudged the case. Moreover, the information he communicated concerned Hayat’s lawyer, not Hayat, and was accidentally rather than deliberately obtained. Both of these circumstances undermine any inference of bias against Hayat arising from Cote’s disregard of instructions given to jurors regarding contact with media reports of the trial.
Hayat maintains nonetheless that Cote’s misconduct as a juror, in combination with his “racial” statements during deliberations and his Atlantic Monthly interview, demonstrates that he harbored an impermissible bias against Hayat. He argues that the district court engaged in a “divide-and-eonquer” analysis and failed to aggregate the evidence of bias. But the district court expressly recognized that “[t]he determination as to whether a juror is biased must be founded on an examination of all relevant evidence of bias and misconduct in the aggregate rather than in isolation” (citing Green v. White, 232 F.3d 671, 678 (9th Cir.2000)). Even considering all the evidence together, the district court concluded that “Hayat has not shown that Cote was not a fair and impartial juror.”
That finding was not clearly erroneous. Although the evidence Hayat points to, taken together, may demonstrate that Cote was confident in his decision to con *891 vict, it does not establish that Cote was determined to convict before the close of evidence, or that Cote was actually biased against Hayat on account of his race, ethnicity, or religion. The district court did not clearly err in determining that Cote was not motivated by an impermissible racial, ethnic, or religious bias.
B.
As discussed above, seven recorded conversations between Hayat and Khan were introduced into evidence. On direct examination, the government questioned Khan about these and other conversations, both recorded and unrecorded.[12] During cross-examination, the district court prevented Hayat on three occasions from questioning Khan about out-of-court statements Hayat had made to Khan. Specifically, Hayat sought to elicit from Khan testimony about whether Hayat ever told him that he attended a camp run by Tablighi Jamaat, a non-Jihadist religious organization, and about whether Hayat had made a statement to Khan in October 2008 that “he never intended to go to a camp.”
First was the following exchange:
Q. BY MS. MOJADDIDI [Hayat’s counsel]: Do you now recall calling Hamid Hayat’s house on October 7, 2003 while he was in Pakistan?
A. [KHAN]: Yes.
Q. And then do you recall Hamid telling you—
MS. FERRIS [Prosecution]: Objection. Hearsay.
MS. MOJADDIDI: Your Honor, it’s not being offered for the truth, it’s being offered to show the effect the statement had on the listener, on Mr. Khan.
It’s relevant because, as the witness is testifying, he made repeated phone calls, and made repeated inquiries to the defendant, and this is a statement that was made to him by the defendant in response to his inquiries.
THE COURT: Sustained.
Q. BY MS. MOJADDIDI: During that conversation, did you ask Hamid Hayat if he was at a camp during that conversation?
A. Don’t remember.
Q. Do you have any reason to believe— did you have any reason to believe at the conclusion of that conversation that Hamid Hayat had attended a terrorist training camp?
MS. FERRIS: Objection. Foundation. And she’s angling towards the hearsay issue again.
MS. MOJADDIDI: It’s — to the hearsay, again, it’s not being offered for the truth, it’s being offered to what his impression was. It’s an operative fact of why the — the steps that he made, the phone call that he made that day, and the phone calls before this, the phone calls after this.
It just shows what he was doing in his role as an informant with the defendant. ...
THE COURT: Sustained.
Q. BY MS. MOJADDIDI: Did you also call Hamid Hayat on October 8, 2003?
A. Yes, I did.
Q. You didn’t get a hold of Hamid on that date, did you?
A. Don’t remember.
*892 Q. Did Hamid ever tell you he attended Tablighi Jamaat camp?
MS. FERRIS: Objection. That’s the hearsay — may we approach?
THE COURT: Yes.
(Bench conference.)
MS. FERRIS: Laura Ferris for the government, Your Honor.
The recent objections and the attempts of counsel related to bringing in Hamid’s statements that he attended a Tablighi Jamaat, which is a group of people that travel around from mosque to mosque, and they do, I’m paraphrasing, essentially missionary work within the Islamic faith, and to the extent that Hamid made those statements to [Khan], they are being offered for the truth of the matter asserted. And she has tried numerous ways to get at that issue when there is, in fact, no exception to the hearsay rule under these circumstances.
I can offer, if you will, the conversation she’s referring to in summary format, if it’s helpful to the Court, but there is simply no hearsay exception to it.
MS. MOJADDIDI: Your Honor, this witness has testified that he relied on a number of statements that Hamid Hayat made in his role as an informant and the information that he gave to the FBI. This is a — this statement is a statement that Hamid made to him, and it affected the rest of the investigation against Hamid. And for that reason it’s not being offered for the truth of the matter, it’s being offered to show how he — why he proceeded to conduct the rest of his duties as an informant in this investigation even beyond this date. He continually relied on the defendant’s statements in each move that he made. So it goes to his — it goes to explain his conduct as an informant.
THE COURT: Sustained.
The second instance occurred over a week later, again in Khan’s testimony on cross-examination:
Q. BY MS. MOJADDIDI: You testified on direct that one time you talked to Hamid over the telephone while he was in Pakistan, and he told you that he was actually at a Tablighi Jamaat camp. Do you recall that on direct?
MS. FERRIS: Objection. Foundation. And may we approach, Your Honor?
THE COURT: Okay.
(Bench conference.)
MS. FERRIS: Laura Ferris for the government, Your Honor. If you’ll recall, during an earlier part of cross-examination, Ms. Mojaddidi attempted to get into a hearsay statement concerning Hamid and Tablighi Jamaat, and this Court sustained that objection and found it was inappropriate hearsay information. She is now again eliciting this information in the form of a question, and going over a topic which the Court has previously ruled was not appropriate.
So the Court — the government asks the question be stricken and she be admonished from going into that area again.
MS. MOJADDIDI: ... At the time when the Court — when the government made the objection and the Court made its ruling, I did not recall that that specific question, that specific topic, was covered word for word by counsel for the government on direct examination. And all I am doing is going back to that. I am not eliciting anything new.
THE COURT: The hearsay rule allows the government to introduce a statement against your client, but it does not allow *893 you to use a statement that — for the truth of the matter asserted therein in favor of your client. That is hearsay.
THE COURT: Sustained.
Shortly after this exchange, the district court sustained a third hearsay objection:
Q. BY MS. MOJADDIDI: I asked you earlier about a conversation that took place on October 7, 2003, when you called Hamid while he was at Pakistan. That was the last time that you contacted him between that date and then May 31st of 2005, correct?
A. [KHAN]: It was in October. I don’t remember the exact date.
Q. During that October 7th conversation, Hamid told you that he never intended on going to a camp, and he was lying to you all along, didn’t he?
MS. FERRIS: Objection. Foundation. Hearsay. Move to strike.
THE COURT: Sustained. It’s stricken.
Hayat argues that the district court erred in two ways with respect to these rulings: (1) by preventing Khan from answering on cross-examination questions about whether Hayat ever told him that he attended a camp run by Tablighi Jamaat, a non-Jihadist religious organization; and (2) by preventing Khan from answering on cross-examination the question whether Hayat told him in October 2003 that he never intended to go to a camp.
The first objection is easily dispatched. Regardless of whether the district court ought to have permitted Khan during cross-examination to answer questions regarding Hayat’s statements about Tablighi Jamaat, the information Hayat’s counsel sought to elicit was already in the record. On direct examination, Khan testified that Hayat had told him that he had attended a Tablighi Jamaat camp:
Q. BY MS. FERRIS: Do you recall what Hamid Hayat said about Tablighi Jamaat?
A. [KHAN]: One time when I talked to him over the phone when he was in Pakistan, he actually was — went to Ta-blighi Jamaat.
Q. And did he indicate to you how long he was there?
A. I’m sorry, I can’t recall right now.
In responding to the prosecutor’s objection during cross-examination, Hayat’s counsel specifically stated that she was “not eliciting anything new.” Therefore, any error in failing to admit the testimony again on cross-examination could not have been prejudicial, as the information was already in the record.
Whether the district court ought to have admitted Hayat’s statement that “he never intended on going to a camp” is a closer question. On appeal, Hayat argues that the statement should have been admitted to prove his then-existing intent, see Fed.R.Evid. 803(3), and also under the so-called rule of completeness, see Fed.R.Evid. 106.
1.
Although “[w]e generally review a district court’s evidentiary rulings for abuse of discretion,” United States v. Boulware, 384 F.3d 794, 800-01 (9th Cir.2004), the government urges us to apply a plain error standard here. We should review the district court’s rulings for plain error, the government argues, because Ha-yat’s proffered grounds on appeal for admitting the statement were not raised at trial. We agree.
Federal Rule of Criminal Procedure 51(b) provides that “[a] party may preserve a claim of error by informing the court — when the court ruling or order is made or sought — of the action the party wishes the court to take, or the party’s objection to the court’s action and the grounds for that objection.” Fed. *894 R.Crim.P. 51(b) (emphasis added). Additionally, Rule 51(b) states that “[a] ruling or order that admits or excludes evidence is governed by Federal Rule of Evidence 103.” Id.[13] Federal Rule of Criminal Procedure 52(b) provides that even if a claim of error was not preserved, an appellate court may consider a “plain error” affecting “substantial rights.” Fed.R.Crim.P. 52(b).
Hayat maintains that under Federal Rule of Evidence 103, the only requirement for preserving an objection to a ruling excluding evidence is that “the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.” Fed.R.Evid. 103(a)(2) (2006). Applying this understanding, Hayat contends that in this case defense counsel adequately preserved the error by making clear the content of the excluded statements, although counsel did not apprise the court of the grounds on which he now argues that the statements should have been admitted.
Rule 103 states that an offer of proof is a prerequisite to challenging excluded evidence, but it does not state that it is the only prerequisite. Moreover, like Federal Rule of Criminal Procedure 52(b), Rule 103 provides that where “errors ... were not brought to the attention of the court” plain error review standards apply. Fed.R.Evid. 103(d) (2006).[14]
The Supreme Court has held in the civil context that challenges to evidentiary rulings are governed by both Rule of Evidence 103 and Federal Rule of Civil Procedure 46, the civil rule directly corresponding to Federal Rule of Criminal Procedure 51, which likewise requires a party objecting to a ruling to state the grounds for his objection. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 174, 175 n. 22, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (“We have no quarrel with the proposition that counsel must articulate the grounds on which evidence should be admitted.”). There is no reason why the standard should be any different in the criminal context. See Fed.R.Crim.P. 51, advisory comm, notes (1944) (“This rule is practically identical with rule 46 of the Federal Rules of Civil Procedure.... It relates to a matter of trial practice which should be the same in civil and criminal cases in the interest of avoiding confusion.”). The addition of a cross-reference to Federal Rule of Evidence 103 in the criminal rule but not the civil rule cannot matter, as that amendment was made in the course of an overall stylistic revision of the criminal rules and was added only to ensure that Rule 103 remained applicable as before. See Fed.R.Crim.P. 51, advisory comm. notes (2002).
Indeed, we have generally reviewed such evidentiary rulings “challenged on appeal on grounds not raised in the district court” for plain error. United States v. Reese, 2 F.3d 870, 892 (9th Cir.1993). In United States v. Chang, for example, we noted that the defendant “never informed the district court that he was offering the testimony in question as a party-opponent admission (or for any other nonhearsay purpose or under any exception to the hearsay rule, for that matter).” 207 F.3d *895 1169, 1176 (9th Cir.2000). Quoting an earlier case that held that “ ‘[i]f a party fails to state the specific grounds upon which evidence is admissible, the issue is not preserved for review, and the court of appeals will reverse only for plain error,’ ” id. (quoting Arizona v. Elmer, 21 F.3d 331, 334 (9th Cir.1994)), Chang held that the exclusion of the testimony at issue could “be reviewed only for plain error,” because although its content was apparent, the justification for its admission was not. Id.
We have indicated that the same principle continues to apply since the amendment to Rule 51, see United States v. Bonds, 608 F.3d 495, 502 (9th Cir.2010), and we apply it here. Hayat put forward a reason for admitting the statement at trial — to explain why Khan acted the way he did — entirely different from the grounds he now advances on appeal. When a party gives an invalid reason for admitting a statement at trial, the district court is not required to come up on its own with alternative grounds on which the statement could be admitted, unless failing to do so would constitute plain error. We therefore review the district court’s exclusionary rulings for plain error, See Reese, 2 F.3d at 892. In so doing, we do not decline to consider the challenged rulings altogether; we simply review them under a somewhat more deferential standard.[15]
“Under a plain error standard, relief is not warranted unless there is: (1) an error; (2) that was plain; and (3) that affected the defendant’s substantial rights.” United States v. Tran, 568 F.3d 1156, 1163 (9th Cir.2009) (citing Jones v. United States, 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999)). “Even if these conditions are met, reversal is discretionary and will be granted only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.” Id. (internal quotation marks omitted). We reach here only the first two prongs of the plain error test, and so do not decide whether Hayat’s substantial rights were affected.
2.
Hayat maintains on appeal that the statement that he “never intended on going to a camp” was admissible under Federal Rule of Evidence 803(3), as a declaration of his then-existing state of mind. We cannot say that refusing to admit the excluded statement as a declaration of current state of mind was plain error.
In 2006, Rule 803(3) provided that “[a] statement of the declarant’s then existing state of mind ... (such as intent ...)” is “not excluded by the hearsay rule.” Fed.R.Evid. 803(3) (2006). The state-of-mind exception does not include “a statement of memory or belief to prove the fact remembered or believed.” Id.
On its face, the statement “I never intended on going to a camp” is backward-looking, expressing Hayat’s memory of his earlier states of mind, and so is not admissible under Rule 803(3). Hayat argues, however, that in the context of Khan’s repeated and emphatic urging that Hayat go for training, the statement also communicated Hayat’s present intent not to attend a training camp. Hayat offers an example to illustrate this point: If someone asked you when you were going to the movies today and you responded, “I never intended to go to the movies today,” your response, despite the use of past tense, could be understood as communicating *896 your present intent not to go to the movies.
Hayat’s interpretation of the statement he sought to elicit, however, is far from obvious, as it is inconsistent with ordinary grammar. The statement could quite reasonably be understood as purely retrospective. To illustrate, in the example, one could follow the sentence, “I never intended to go to the movies,” with the statement, “But I will go,” or one could harbor that changed intent but not communicate it without being duplicitous.
Moreover, even under the state-of-mind exception, the statement could only have been admitted with a limiting instruction: it was not admissible for the purpose of proving Hayat’s earlier states of mind, including whether he had lied earlier when he said that he did intend to go. Hayat never asked for a limiting instruction, making it all the more likely that the statement would be understood by the district court in its retrospective sense. Given the retrospective language used in the statement Hayat sought to admit and the failure to clarify, by offering a limiting instruction, that only the present-tense meaning was intended, we cannot say that the district court plainly erred in failing to admit it under the state-of-mind exception. See Smith, 424 F.3d at 1002 (“[A]n error is not plain unless it is ‘clear’ or ‘obvious.’ ” (quoting United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993))); United States v. Turman, 122 F.3d 1167, 1170 (9th Cir.1997) (“Plain error ... is error that is so clear-cut, so obvious, a competent district judge should be able to avoid it without benefit of objection.”).
Hayat also contends that the excluded statement was admissible under the rule of completeness. See Fed.R.Evid. 106 (2006) (“When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.”). As Hayat acknowledges, however, our cases have applied the rule of completeness “only to written and recorded statements.” United States v. Ortega, 203 F.3d 675, 682 (9th Cir.2000). Moreover, Rule 106 “does not compel admission of otherwise inadmissible hearsay evidence.” United States v. Collicott, 92 F.3d 973, 983 (9th Cir.1996) (internal quotation marks omitted). Thus, the district court did not err in failing to admit the excluded statement under the rule of completeness.
Judge Tashima maintains in dissent that the excluded statement was also admissible for the purpose of impeachment under Federal Rule of Evidence 607. See Dissent at 907-08. But even if this evidence could have been admissible under Rule 607, Hayat did not raise this limited basis for admissibility at trial or on appeal. We therefore need not address the contention.
In any event, the exclusion was not plain error. The dissent suggests that the district court should have known that the statement was admissible for impeachment purposes even if Hayat’s counsel did not request admission for that limited purpose, for the following reason: Khan testified that when he called Hayat a liar, he was merely teasing or joking — he did not actually think Hayat was lying, at least about significant points such as whether Hayat attended a training camp. Such testimony was elicited on direct examination on February 28, 2006 and on cross-examination on March 2, 2006. According to the dissent, the “never intended” statement impeached this aspect of Khan’s testimony, by demonstrating that Khan had been told, by Hayat, that Hayat had in fact been lying as to whether he intended to go to a training camp.
*897 First of all, it was not until more than a week after Khan’s testimony about whether he believed Hayat to be a liar, on March 10, 2006, that Hayat’s counsel sought to introduce Hayat’s statement that he “never intended” to go to a training camp. Thus, for the district court to recognize that the statement might be admissible for impeachment purposes, the judge would not only have had to know that hearsay evidence is admissible for impeachment purposes — which of course he would have — but he would also have had to remember Khan’s testimony, given over a week previously. He would then have had to recognize that the statement Hayat sought to introduce could be understood as in tension with that testimony, even though it concerned a different conversation than the “liar” conversation, about a somewhat different matter, and even though the question whether Khan had reason to believe that Hayat was a braggart or a liar is quite peripheral to whether Khan was truthful as to the objective facts he reported, as well as to whether Hayat was a braggart or a liar.
Moreover, Hayat’s counsel not only failed to indicate an impeachment purpose for the introduction of the evidence, she indicated otherwise — that she sought admission of the evidence either to explain the effect of the statement on Khan’s investigation of Hayat or for the truth of the matter asserted. She did not indicate that Khan had testified to anything that contradicted the evidence she sought to introduce. The district court therefore had no occasion — on any legal ground, enunciated or not — to consider whether the contested statement could be introduced only to impeach Khan with regard to whether he actually thought Hayat was a liar, a much more limited — and peripherally relevant— purpose than the use Hayat’s counsel sought to make of the statement.
Under these circumstances, the failure of Hayat’s attorney to explain the connection between the proffered statement and Khan’s prior testimony may be relevant to a later claim for ineffective assistance of counsel.[16] But the district court’s failure to recognize such a basis on its own was not plain error.
Aside from his arguments for admissibility under various evidentiary rules, Hayat also suggests on appeal that the district court’s hearsay ruling was a limitation on his cross-examination of Khan that violated his rights under the Confrontation Clause. This argument too fails.
First, the district court’s hearsay rulings overall did not deny Hayat his right to confront Khan “in the traditional sense.” United States v. Lopez-Alvarez, 970 F.2d 583, 587 (9th Cir.1992). Hayat had the opportunity to engage in extensive cross-examination. The jury was aware that Khan was a paid FBI informant and that the FBI was his sole employer for several years. In addition, Khan admitted that he had previously been convicted of a crime involving the passing of fraudulent checks. “Generally, once cross-examination reveals sufficient information with which to appraise a witness’s possible bias and motives, confrontation demands are satisfied.”[17] Id. (quoting United States v. *898 Bonanno, 852 F.2d 434, 439 (9th Cir.1988)). The excluded testimony in no way went to the heart of why Khan was testifying or whether he was lying, and the permitted cross-examination of Khan “was adequate to develop the issue of bias properly to the jury.” Davis v. Alaska, 415 U.S. 308, 318, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); see also Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (“[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things ... interrogation that is repetitive or only marginally relevant.”).
Second, “the excluded testimony [primarily] served the purpose of furthering the theory of the defense and not of impeaching the prosecution’s witness.” United States v. Lopez-Alvarez, 970 F.2d 583, 587 (9th Cir.1992). Hayat does not argue on appeal that the excluded testimony indicated that Khan had misreported any of Hayat’s earlier statements regarding his intent to go to a terrorist training camp or was otherwise unreliable in his account of his relationship with Hayat. Instead, Hayat maintains that in her cross-examination of Khan, and later in her closing argument, defense counsel sought to demonstrate that Hayat was a braggart and a storyteller who never sincerely intended to train for jihad and never did, and that the statement that Hayat “never intended on going to a camp” fit neatly into this theory. As noted, however, under the hearsay rules, the October 7, 2003 statement could only be introduced for its truth, if at all, with respect to Hayat’s intention on that day. Hayat’s constitutional argument, at bottom, seeks to explain why the statement should have been admitted for both Hayat’s then-present intent, as well as his previous intent, and so is better framed as “directed at demonstrating a denial of [the] ... guarantee of ‘a meaningful opportunity to present a complete defense.’ ” Id. at 587-88 (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)).[18]
As we recognized in Lopez-Alvarez and again in Chia v. Cambra, 360 F.3d 997, 1003, 1006 (9th Cir.2004), “[e]ven when evidence is excluded on the basis of a valid application of the hearsay rules, such exclusion may violate due process if the evidence is sufficiently reliable and crucial to the defense.” Lopez-Alvarez, 970 F.2d at 588 (citing Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).
Here, however, the excluded evidence— Hayat’s statement that he “never intended on going to a camp” — is not sufficiently reliable to meet the Chambers standard. In Chambers, the state court prevented *899 the defendant in a murder prosecution from presenting three witnesses who would testify that another man had confessed to each of them separately that he was the murderer. 410 U.S. at 292-93, 93 S.Ct. 1038. In holding that the exclusion of the evidence violated the defendant’s due process rights, the Supreme Court emphasized the reliability of the excluded statements: the confessions were made spontaneously to close acquaintances shortly after the murder occurred, each confession was corroborated by some other evidence in the case, and “each confession ... was in a very real sense self-incriminatory and unquestionably against interest.” Id. at 300-01, 93 S.Ct. 1038. Following Chambers, our cases holding hearsay evidence unconstitutionally excluded because essential to the presentation of a defense have insisted that such evidence bear “persuasive assurances of trustworthiness,” Chia, 360 F.3d at 1006 (internal quotation marks omitted); typically, the cases involve inculpatory statements by third parties, see Lunbery v. Hornbeak, 605 F.3d 754, 761 (9th Cir.2010); Chia, 360 F.3d at 1004.
Here, the contested statement lacked the requisite “persuasive assurances of trustworthiness.” To begin with, the statement was exculpatory as to the speaker, Hayat, not inculpatory. Nor has Hayat pointed to evidence corroborating the excluded statement.
The only suggestion as to why the statement might be reliable came from the government at trial: The prosecutor argued in closing that
Hamid Hayat considered Naseem Khan to be his, quote, best friend.... Hamid Hayat thought he could trust Naseem Khan.... He let his guard down. He spoke openly. He spoke freely. And when you hear the words that Hamid Hayat said during his conversations with Naseem Khan, you get a chance to see the real Hamid Hayat.
But the statement Hayat attempted to introduce was made on October 7, 2003, apparently the last time Hayat spoke with Khan before returning to the United States in May 2005. The record contains very little information about why the communications between Khan and Hayat lapsed for more than a year and a half right after the contested conversation. Hayat asserts that one can infer — there was no evidence to this effect — that he broke off communication with Khan because he was tired of Khan’s insistence that he go to a training camp. It is an equally plausible inference, however— again, the trial evidence is silent as to this point — that Hayat had grown suspicious of Khan, because of that very insistence or for some other reason, and so cut off the relationship. In that case, Hayat could have lied when he said he never intended to go to a camp, hoping to throw Khan off his trail just before he stopped speaking with him entirely.
In short, Hayat’s statement was not sufficiently reliable to satisfy the standard developed in the Chambers line of cases, and the district court did not commit constitutional error by excluding it. Because we hold that the district court did not plainly err in its hearsay rulings, we do not reach the question whether the exclusion of evidence affected the outcome of the trial.
3.
As part of his argument that the district court erred in limiting the cross-examination of Khan, Hayat contends the district court improperly restricted discovery of classified information about Khan under the Classified Information Procedures Act (“CIPA”), 18 U.S.C. app. 3. The government must disclose classified infor *900 mation only if it is “ ‘relevant and helpful to the defense of an accused.’ ” United States v. Klimavicius-Viloria, 144 F.3d 1249, 1261 (9th Cir.1998) (quoting United States v. Yunis, 867 F.2d 617, 623 (D.C.Cir.1989)). We have reviewed the classified material that the district court reviewed when it granted the government’s motion for a protective order under CIPA, and conclude that the information it contains would not have been helpful to the defense. The district court did not err in precluding discovery of the information or in limiting Hayat’s cross-examination of Khan concerning it.
C.
Finally, Hayat argues that the district court erred when it (1) permitted the government’s expert, Khaleel Mohammed, to testify about the meaning and implications of the Arabic note found in Hayat’s wallet; (2) did not allow Hayat’s expert, Anita Weiss, to testify that the note was a ta’wiz; and (3) excluded the testimony of defense expert James Wedick, a former FBI agent. We review for abuse of discretion a district court’s decision to admit or exclude expert testimony. See United States v. Seschillie, 310 F.3d 1208, 1211 (9th Cir.2002).
1.
Prosecution witness Khaleel Mohammed, an expert in Islamic studies, provided a translation of an Arabic note found in Hayat’s wallet upon Hayat’s return from Pakistan. He testified that the note was a supplication reading: “Oh Allah we place you at their throats and we seek refuge in you from their evils.”[19] Mohammed further opined that the “kind of person” who would carry that supplication would be one “who perceives him or herself as being engaged in war for God against an enemy.” He testified that the fact that the supplication was being carried in a wallet meant that “[t]he person was completely ready” to commit “an act of warfare against a perceived enemy.”
As Hayat did not object to the admission of Mohammed’s testimony at trial, we review the admission of the testimony for plain error. See Reese, 2 F.3d at 892. Hayat challenges the admission of Mohammed’s testimony on two grounds. First, he contends that Mohammed’s testimony was inadmissible under Federal Rule of Evidence 702 because it exceeded the scope of Mohammed’s expertise and was not reliable. In 2006, Rule 702 provided:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Mohammed’s analysis of the meaning of the supplication was well within the scope of his expertise. Mohammed is a professor of Islamic studies at San Diego State University and has earned several advanced degrees in the field. He is fluent in both modern and classical Arabic and has served as an imam at a mosque in the United States. Mohammed testified that he had interpreted between 50 *901 and 500 supplications and that he had interpreted Islamic texts “from a faith-based perspective, as well as from an academic perspective.”
Mohammed also used reliable methods. To interpret the supplication, he relied on (1) his own extensive knowledge of Arabic and Islamic law, (2) a thorough review of relevant Islamic source materials, and (3) the opinions of other academics and religious scholars. At trial, Mohammed testified in detail about his methods.
We reject Hayat’s arguments that because Mohammed was not an expert on Pakistani culture and did not speak Urdu (the national language of Pakistan), he was unqualified to offer his opinions about the note found in Hayat’s wallet. Mohammed did not testify about Pakistani culture or anything written in Urdu. He testified about the meaning of an Islamic supplication written in Arabic, a topic squarely within his expertise. The district court did not err in admitting Mohammed’s testimony under Rule 702.
Second, Hayat contends that Mohammed’s testimony ran afoul of Rule 704(b). In 2006, that Rule provided: “No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.” Mohammed testified that the “kind of person” who would carry the note found in Hayat’s wallet was “[a] person who is engaged in jihad”; that such a note would be used “[b]y people who perceive themselves in a state of war”; and that a person who carried such a note “was in the act of being a warrior.” We might well agree with the dissent, see Dissent at 911-12, that these and similar statements made by Mohammed could be held to violate Rule 704(b) were we considering the scope of that rule ab initio.
But we are not. Our caselaw has interpreted that rule much more narrowly than its text might indicate. Under our precedent, Rule 704(b) “does not bar testimony supporting an inference or conclusion that a defendant does or does not have the requisite mental state, ‘so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.’ ” United States v. Younger, 398 F.3d 1179, 1189 (9th Cir.2005) (quoting United States v. Morales, 108 F.3d 1031, 1038 (9th Cir.1997)). In Younger, for example, the jury was required to decide whether the defendant possessed cocaine base with the intent to distribute it. An expert witness for the prosecution testified that “[t]he person, individual, whoever possessed this, possessed it for the purposes of selling.” Id. (emphasis removed). We upheld the admission of the testimony because “the expert never directly commented on defendant’s mental state, and the jury could have accepted his testimony and still infer that defendant was atypical.” Id. at 1190.
Similarly, in United States v. Gonzales, we held that expert testimony that a “person [who] was carrying those items [was carrying them] for the purpose of distributing the drugs” did not violate Rule 704(b) because “[e]ven if the jury believed the expert’s testimony, the jury could have concluded that [the defendant] was not a typical or representative person, who possessed the drugs and drug paraphernalia involved.” 307 F.3d 906, 911 (9th Cir.2002); see also United States v. Anchrum, 590 F.3d 795, 804-05 (9th Cir.2009) (affirming, in a case where the defendant was charged with the possession of firearms in furtherance of drug trafficking, the district court’s admission of expert testimony that *902 “if you’re driving around with a loaded weapon and you have narcotics in your car, ... [y]ou’re either going to use [the weapon]” to get away from law enforcement, as protection against getting “rip[ped] ... off’ in a drug deal gone bad, or to protect money earned through drug deals); United States v. Gomez-Norena, 908 F.2d 497, 501-02 (9th Cir.1990) (holding that it was not plain error for the district court to admit an expert’s testimony that it was his “opinion” that “approximately $200,000 worth of cocaine” was “possess[ed] with intent to distribute” and not for “personal use”).
Here, Mohammed testified about the kind of person who would carry a note such as the one found in Hayat’s wallet, but he never commented directly on Ha-yat’s mental state. Mohammed’s testimony about the typical “person” carrying the supplication is indistinguishable in its degree of precision from the expert testimony found admissible in Younger and Gonzales. Therefore, if the district court erred at all in admitting the testimony, such error certainly was not plain, given our precedents limiting Rule 704(b) essentially to a semantic preclusion. Thus, while we might like to agree with Judge Tashi-ma that the expert evidence in this case crossed the Rule 704(b) line, we are prevented from doing so by this court’s case-law.
2.
Defense expert Anita Weiss testified about the Pakistani practice of carrying a ta’wiz, which she defined as an Arabic verse or prayer used by Pakistanis as a talisman, for luck or protection, often when traveling. The defense’s theory was that the note found in Hayat’s wallet was a benign ta’wiz that Hayat had been carrying to protect himself while traveling, and that it had no jihadist import.
On direct examination, Hayat’s counsel asked Weiss whether she believed that the particular writing found in Hayat’s wallet was a ta’wiz. The government objected, citing a lack of foundation or basis under Rule 702. The district court sustained the objection on the ground that Weiss was unqualified to evaluate the content of the writing because she did not know Arabic.
The district court did not abuse its discretion in excluding Weiss’s testimony as to whether the note found in Hayat’s wallet was a ta’wiz. First, it is undisputed that Weiss does not speak Arabic. Nor did she testify that all ta’wiz charms look alike or can be distinguished from other Arabic writings based on their physical appearance alone. On the contrary, she explained that such charms may take different forms and are worn or used in a variety of ways: “usually it’s either something that can be tied around your neck, or it can be something ... tied around your arm. Or else it could be something where it’s phrases either from the Koran, or the Hadith, or a prayer that is mixed with water, and some people put some sugar in it, you mix it up and drink it, or you can even eat a ta’rnz.” It was therefore reasonable for the court to conclude that she was not qualified to identify the particular note found in Hayat’s wallet.
Second, contrary to Hayat’s contention, Weiss was permitted to testify “about the cultural practice and meaning of carrying Arabic scriptures.” She testified at length about ta’wiz charms, their cultural significance, their “extremely common” use by travelers, and the fact that they are written in Arabic and not Urdu. The district court only prohibited her from specifically identifying the note found in Hayat’s wallet as a ta’wiz. It was not an abuse of discretion to exclude that portion of Weiss’s testimony.
*903 3.
Hayat also attempted to present James Wedick, a former FBI agent, as an expert witness. In his Rule 16 disclosure statement, Hayat stated that Wedick would testify, among other things, that “the FBI Sacramento office had the capability to videotape Hamid Hayat’s interview right when it actually started”; that “the interviewing agents did not consider but should have considered [Hayat’s] vulnerabilities as an interviewee”; and that the agents “all used leading questions during the interviews of Hamid Hayat.” The district court excluded Wedick’s testimony in its entirety, finding that much of the testimony was of “marginal probative value” and that its value was outweighed by the risk of confusing the jury, wasting time, and presenting needless cumulative evidence. The court also concluded that Wedick’s testimony “would not assist the trier of fact.”
The district court did not abuse its discretion in so ruling. The jurors viewed the videotapes of some sessions of Hayat’s FBI interview. It would have added nothing for Wedick to testify that the Sacramento FBI office had the capability to videotape Hayat’s interview in toto — that was obvious, as they did videotape the last two sessions — or that the agents “all used leading questions” — the jurors could see that for themselves. Moreover, Hayat’s counsel thoroughly explored the conduct of the agents who participated in Hayat’s interview, including the improper use of leading questions, during her cross-examination of those agents. Finally, as to Wedick’s proposed testimony that the agents failed to consider Hayat’s “vulnerabilities,” the jurors again could see for themselves whether Hayat appeared tired, isolated, or naive during the videotaped interview sessions. Nor was it clear that Wedick had particular expertise in the field of false confessions. The district court did not abuse its discretion in excluding Wedick’s testimony.
III.
After sentencing, Hayat filed a motion to vacate his convictions under 28 U.S.C. § 2255. He argued that his trial counsel, who had never before tried a federal criminal case, had a conflict of interest because she relied heavily for legal and strategic advice on the more experienced lawyer representing Hayat’s father, Umer, in their joint trial. Hayat also argued that his trial counsel was constitutionally ineffective because, among other things, she did not take advantage of procedures that would have allowed her to depose potentially exculpatory witnesses in Pakistan who were unavailable for trial, and she failed to preserve objections to several of the district court’s evidentiary rulings. The district court dismissed Hayat’s § 2255 motion without prejudice because his criminal appeal was pending before this court. Hayat now asks us to review the district court’s dismissal order.
Hayat did not timely file a notice of appeal of the district court’s dismissal order, which postdated by several weeks Hayat’s notice of appeal in his criminal case. See Fed. R.App. P. 4(a); see also Rule 11, Rules Governing Section 2255 Proceedings for the United States District Courts. We therefore lack jurisdiction to review the district court’s dismissal of Hayat’s § 2255 motion, see United, States v. Sadler, 480 F.3d 932, 937 (9th Cir.2007) (“Rule 4(a) ... is both mandatory and jurisdictional.”). This holding is, of course, without prejudice to our authority to review the district court’s determinations on any later, properly filed initial § 2255 motion encompassing the claims Hayat sought to raise in the motion dismissed without prejudice, and expresses no view as to the merits of any of those contentions.
*904 CONCLUSION
We affirm Hayat’s convictions. We also grant the government’s motion to dismiss the appeal of the order dismissing without prejudice Hayat’s motion to vacate his convictions under 28 U.S.C. § 2255. We deny the government’s motion to strike portions of the opening brief that cite to materials outside the record as moot.
AFFIRMED.

. At Hayat’s trial, government witnesses conceded that it was highly unlikely that the individuals identified by Khan had been in Lodi in the late 1990s.

. The FBI paid Khan between $3,000 and $4,500 per month plus expenses.

. Hayat's father, Umer Hayat, was indicted on two counts of making false statements to the FBI — namely denying that he had firsthand knowledge of terrorist training camps in Pakistan and denying that he knew that Ham-id had attended a camp — in violation of 18 U.S.C. § 1001. After a jury failed to reach a verdict on those counts, Umer Hayat pled guilty to making a single false statement to the FBI and U.S. Customs and Border Protection — falsely denying that he was carrying more than $10,000 while on a flight from the United States to Pakistan. Umer Hayat was sentenced to time served, approximately 11 months.

. Hayat’s name appeared on the “No Fly” list as a result of the information provided by Khan.

. We note that Hayat does not argue on appeal that Cote’s acts of misconduct prejudiced his trial. Instead, he argues that Cote’s misconduct is evidence of his actual bias against Hayat, because it illustrates the lengths to which he was willing to go to secure a conviction. We therefore apply the standard of review applicable to claims of juror bias, not the standard applicable to denials of motions for a new trial based on juror misconduct.

. In 2006, Federal Rule of Evidence 606(b) provided:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon that or any other juror’s mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror’s mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury’s attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.
(Each of the Federal Rules of Evidence cited in this opinion was amended in 2011 "for purely stylistic reasons; the changes do not reflect an intent to change any result in any ruling on'evidence admissibility.” See United States v. Solorio, 669 F.3d 943, 950 n. 8 (9th Cir.2012) (internal quotation marks omitted). Throughout the opinion, we cite the rules in effect at the time of Hayat’s trial.)

. It is not clear to us why the district court thought Rule 606(b) could apply to bar the introduction of statements made after deliberations were over. Whether those statements could then be used to make inferences about the deliberation process is, of course, a different question.

. The district court credited Cote’s assertions at the evidentiary hearing that he did not have the thoughts he expressed to the Atlantic *889 Monthly “before the commencement of ... jury deliberations.”

. Unlike the presence of juror bias, juror misconduct can be harmless error that does not require a new trial. See Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir.2000).

. Hayat also made this alternative argument in his motion for a new trial.

.Although the district court conducted an evidentiary hearing at which it questioned Cote about Hayat’s various allegations of misconduct, the court assumed that Hayat's representation of the conversation between Cote and W. was accurate. We proceed on that basis.

. Although not all the conversations were recorded, the government produced contemporaneous records of the unrecorded conversations in the form of Khan’s own notes, agents’ notes from his FBI debriefings, or both.

. The language of Rule 51 was amended "as part of the general restyling of the Criminal Rules” in 2002. Fed.R.Crim.P. 51, advisory comm, notes (2002). The changes were “intended to be stylistic only.” Id. The cross-reference to Federal Rule of Evidence 103 was added "because of concerns about the Supersession Clause, 28 U.S.C. § 2072(b), of the Rules Enabling Act, and the possibility that an argument might have been made that Congressional approval of [the amended Rule 51] would supersede that Rule of Evidence.” Id.

. The plain error standard is now codified at Federal Rule of Evidence 103(e).

. Nor, of course, do we preclude a demonstration on collateral review that counsel rendered ineffective assistance in enunciating the basis for admission as she did. Hayat’s attorney may well have been deficient by failing to offer a plausible justification for admission of the “never intended” statement.

. We cannot determine from the current record why defense counsel did not attempt to justify the admission of Hayat’s statements on the bases now asserted. In order to determine whether such failure constituted ineffective assistance of counsel, further factual development not possible on direct appeal is necessary.

. We note that this conclusion is not tantamount to a determination that the exclusion of the evidence could not have affected the outcome of the trial. Rather, our holding here is based only on the limited nature of the Confrontation Clause guarantee.

. As we noted in Lopez-Alvarez, there is in the case law “confusion regarding whether a defendant’s right to a meaningful opportunity to present a complete defense is derived from the right of confrontation or the right to due process.” Lopez-Alvarez, 970 F.2d at 588 n. 4. The lack of clarity we perceived then remains. See Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (" 'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminad defendants a meaningful opportunity to present a complete defense.’ ” (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986))). As in Lopez-Alvarez, in light of this confusion, we consider Hayat's Sixth Amendment right of confrontation argument adequate to invoke on appeal the right to present a complete defense. Lopez-Alvarez, 970 F.2d at 588 n. 4. In doing so, we once again refer to the right to present a complete defense as a "due process right” for simplicity's sake and "do not decide the source of the right.” Id.

. Mohammed noted that the Arabic letters were accompanied by diacritical marks, typically used to aid non-native speakers of Arabic in pronunciation of Arabic words. He surmised that the writing was likely intended to be "read ritually” or "memorized” rather than simply carried as a charm, as is a ta’wiz.