**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
              *Plaintiff-Appellee,*

          v.

CRISTINO LOPEZ-MARTINEZ,
              *Defendant-Appellant.*

No. 07-10174

D.C. No.
CR-05-01145-SMM

OPINION

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, District Judge, Presiding

Argued and Submitted
June 12, 2008—San Francisco, California

Filed September 10, 2008

Before: A. Wallace Tashima, M. Margaret McKeown, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge McKeown

12671

**COUNSEL**

Michael Shay Ryan, Kent & Ryan, P.L.C., Phoenix, Arizona, for the defendant-appellant.

Tracey A. Bardorf, Assistant United States Attorney, Phoenix, Arizona, for the plaintiff-appellee.

## OPINION

McKEOWN, Circuit Judge:

After a five-day trial, a jury convicted Cristino Lopez-Martinez of one count of conspiracy to bring aliens to the United States, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I); one count of aiding and abetting bringing aliens to the United States resulting in death, in violation of 8 U.S.C. § 1324(a)(1)(B)(iv); three counts of aiding and abetting bringing aliens to the United States for profit, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); and one count of illegal re-entry after deportation, in violation of 8 U.S.C. § 1326(a). Lopez-Martinez now appeals his conviction (except the illegal re-entry count) on a multitude of grounds, attacking the actions of the judge, the prosecutor, and the jury. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Lopez-Martinez was convicted based largely on the testimony of Eduardo Camacho-Reyes. The following account of events is taken from that testimony. In the summer of 2005, Camacho-Reyes hired Miguel Cruz-Morales to bring him, his wife, and his two young daughters from Mexico to the United States through the Arizona desert. For this service, Camacho-Reyes agreed to pay $1,800.

In late September, the Camacho-Reyes family traveled to Northern Mexico, where they were met by Miguel and his brother, Cecilio Cruz-Morales, who took them to a house to await the rest of the group that would travel with them. Two evenings later, after the rest of the group arrived, they took a bus into the desert and then began walking. It was at this point

that Camacho-Reyes first saw the man known as "Pedro," whom he later identified as Cristino Lopez-Martinez, the defendant.

As they walked, Lopez-Martinez and each of the Cruz-Morales brothers alternated walking at the front of the group, with one of the others in the middle of the group, and the other one at the back. During breaks, the three men gathered away from the rest of the group and spoke in an indigenous dialect.

The group walked for two nights and two days. Around the middle of the second day, Araceli Escobar-Villa, Camacho-Reyes' wife, collapsed. When Lopez-Martinez came back to check on the family, Camacho-Reyes, who had seen him earlier with a cell phone, asked Lopez-Martinez to call the immigration authorities. Lopez-Martinez replied that he would do so, but only after he moved the rest of the group further ahead "so that he didn't lose them all." Lopez-Martinez returned to the Camacho-Reyes group twice more. After returning for the second time, and learning that Escobar-Villa was dead, Lopez-Martinez left and never returned. About twenty minutes after Lopez-Martinez left, the border patrol independently discovered the group, provided them medical care, and then began processing them for removal to Mexico.

Lopez-Martinez and Miguel Cruz-Morales were found by the border patrol early the next morning, hiding under a bush behind an Exxon station in nearby Dateland, Arizona. When the border patrol agent asked the pair whether they had left anyone out in the desert, Lopez-Martinez replied, "No." Eventually, the border patrol discovered that Lopez-Martinez and Cruz-Morales were part of the group rescued earlier that day. Camacho-Reyes picked Lopez-Martinez and the Cruz-Morales brothers out of a lineup as the leaders of the group. Lopez-Martinez was arrested, tried, and convicted.

## II.  ANALYSIS

### A.  THE TRIAL

Lopez-Martinez was tried before a jury. The trial judge played an active role in the trial. During a break in the prosecution's direct examination of Camacho-Reyes, after the jury had been excused, the judge asked counsel to remain. The judge then explained that he had "some concerns about the quantum of evidence." To the prosecutor, the judge directed:

> [Y]ou have to get the underlying facts out . . . . [T]here's no indication as to when [Lopez-Martinez] was leading what [Camacho-Reyes] observed, what he saw [the alleged smugglers] do. And until you can get some factual underpinnings there, just to let [Camacho-Reyes] say, I think [Lopez-Martinez] was a smuggler, there's no facts by which to help the jury out.

The judge and prosecutor went back and forth for a time, with the prosecutor explaining how she had made, or planned to make, her case, and the judge explaining where he found holes in her evidence and what sort of testimony would be necessary to fill in the gaps. Contrary to Lopez-Martinez's view of the exchange, the judge's remarks were not improper.

**[1]** Lopez-Martinez seems to believe that a trial judge's only role is to call "balls and strikes," standing by to observe and occasionally ruling on objections pitched out by the attorneys. This characterization misconceives the role of the trial judge: "A trial judge is more than an umpire." *United States v. Laurins*, 857 F.2d 529, 537 (9th Cir. 1988). And during a jury trial, the judge is surely more than a robed figurehead who simply observes the proceedings and keeps order. As we have explained, a judge "may participate in the examination of witnesses to clarify evidence, confine counsel to evidenti-

ary rulings, ensure the orderly presentation of evidence, and prevent undue repetition." *Id.*

[2] Although we have not had an opportunity, until now, to directly address the question, our sister circuits have held that there is nothing wrong with a judge suggesting a line of questioning to an attorney. *See United States v. Ramos*, 413 F.2d 743, 746 (1st Cir. 1969) (per curiam) (holding suggestions "by trial judges to prosecutors concerning elements of proof and appropriate lines of inquiry have often been held proper, even when made in the presence of the jury"); *Fischer v. United States*, 212 F.2d 441, 444-45 (10th Cir. 1954) (noting the "court has the power, within reasonable bounds, to question a witness . . . and there is no reason why it may not direct an attorney to pursue a line of questioning if it is relevant to the case"). We agree with the reasoning of these courts; it would be disingenuous to condemn the trial judge's inquiry here, given that it is already well established that the judge may question the witness directly.

[3] We are mindful, of course, that in some cases — although not here — the trial judge's inquiries and suggestions may cross the line and affect the judge's role as an impartial participant in the trial process. "A trial judge's participation [can] overstep[ ] the bounds of propriety and deprive[ ] the parties of a fair trial . . . when 'the record discloses actual bias . . . or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality." *United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001) (quoting *United States v. Mostella*, 802 F.2d 358, 361 (9th Cir. 1986)). The judge's remarks objected to by Lopez-Martinez were made outside the presence of the jury, and evidenced no bias on the part of the judge.

[4] On the contrary, the record suggests that the trial judge's intent was to protect Lopez-Martinez and the fair trial process. After Lopez-Martinez objected to the judge's collo-

quy with the prosecutor, and insinuated that the court was encouraging the prosecution to manufacture testimony, the judge explained that he was concerned that he could not grant a Rule 29 motion in Lopez-Martinez's favor without giving the prosecution a chance to meet his concerns.[1] Additionally, the judge emphasized that Lopez-Martinez was facing a very serious sentence, and that he did not want to see Lopez-Martinez convicted on accusations unsupported by evidence. The clear import of this record, then, is not bias toward Lopez-Martinez, but rather the judge's desire to shore up any Rule 29 ruling in Lopez-Martinez's favor against appeal, and to ensure that if Lopez-Martinez was convicted, it was on the basis of evidence, not speculation. Given the absence of evidence of actual (or even implied) bias and the lack of any effect on the jury, there is no basis for Lopez-Martinez's claim that the trial judge's remarks were improper.

In presenting its case, the prosecution introduced expert testimony from Border Patrol Agent Hector Martinez. After recounting his experience and training, Agent Martinez testified about the methods and patterns of human smugglers in the Yuma area. On appeal, for the first time, Lopez-Martinez argues that Agent Martinez should not have been allowed to testify as an expert.[2] We disagree.

**[5]** As the Supreme Court emphasized in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), with respect to expert testimony "the test of reliability is 'flexible' [and] the law grants a district court the same broad latitude when it

---

[1]Rule 29 provides in part: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

[2]Because Lopez-Martinez did not raise this issue below, we review the admission of this testimony only for plain error, and will "only reverse if the district court committed a clear or obvious error that affected substantial rights or was prejudicial." *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).

decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 141-42. Lopez-Martinez's objections boil down to criticism of the trial judge for not conducting a more formal *Daubert* hearing, or requiring Agent Martinez to give a precise description of each step in the logical chain he used to arrive at his conclusions. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). But, these procedures are not required under Supreme Court precedent or our own case law.

**[6]** Agent Martinez, who has fourteen years of experience as a border patrol agent, including five as the intelligence chief for the Yuma station, testified about patterns and methods common among smugglers in the Yuma area. This evidence was neither rocket science nor complex statistical modeling. Agent Martinez's explanation of his methods and experience was sufficient for the trial judge to be confident in their reliability. *See* Fed. R. Evid. 702 (stating expert testimony may be admitted whenever "it will assist the trier of fact," and that a witness may be qualified by, inter alia, experience, training, or education). The court did not plainly err in admitting this testimony.

**[7]** In light of Agent Martinez's testimony, as well as the testimony of the other witnesses, neither did the court err in denying Lopez-Martinez's Rule 29 motion. When viewed in the light most favorable to the prosecution, a reasonable jury could easily have found the evidence sufficient. *See United States v. Moses*, 496 F.3d 984, 987 (9th Cir. 2007) ("Evidence is sufficient to support a conviction if viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (internal quotations omitted).

The main fact in dispute at trial was whether the prosecution had sufficiently demonstrated that Lopez-Martinez was a foot guide for the group, as opposed to just another client of the smugglers. That this fact was disputed, however, does not

mean that the jury unreasonably found Lopez-Martinez guilty; the jury's job as the factfinder was precisely to resolve disputed issues of fact.

**[8]** Camacho-Reyes testified that Lopez-Martinez led the group during the times when he was in front, and that he would regularly switch places with the Morales brothers in what appeared to be a coordinated fashion. During breaks, Lopez-Martinez and the Morales brothers would gather away from the rest of the group, and talk among themselves. Lopez-Martinez had a cell phone with him, which would be very unusual for a smuggling client, but common for a smuggler. And, Agent Martinez confirmed that Lopez-Martinez's behavior, as described by Camacho-Reyes, fit the patterns that he had observed among smugglers. Viewing the testimony in the light most favorable to the prosecution, a reasonable jury could have found beyond a reasonable doubt that Lopez-Martinez was one of the guides, not simply a client of the Morales brothers.

**[9]** Lopez-Martinez's remaining arguments in support of his Rule 29 motion are based on misapprehensions of the applicable law. Contrary to Lopez-Martinez's assertion, a defendant need not personally know a victim or directly cause the victim's death to be convicted of bringing aliens to the United States resulting in death under 8 U.S.C. § 1324(a)(1)(B)(iv). All that is required under this section is that a defendant know he is bringing aliens to the United States and that the bringing of those aliens to the United States "results in the death of any person." 8 U.S.C. § 1324(a)(1)(B)(iv). Any argument by Lopez-Martinez that he did not know the others in the group were illegal aliens strains credulity.

**[10]** Similarly, Lopez-Martinez's argument that the government failed to establish that he was working for financial gain fails to appreciate the relevant law; where a defendant is charged with aiding and abetting the bringing of aliens to the

United States for financial gain, as Lopez-Martinez was, the government need only show that the principals stood to benefit financially from the smuggling. *See United States v. Tsai*, 282 F.3d 690, 697 (9th Cir. 2002) ("Because Tsai was charged as an aider and abettor under 18 U.S.C. § 2, the government could make out this element merely by proving that a principal — not necessarily Tsai himself — committed the crime with a pecuniary motive; it need not show 'actual payment or even an agreement to pay.' ") (quoting *United States v. Angwin*, 263 F.3d 979, 998 (9th Cir. 2001)); *see also United States v. Munoz*, 412 F.3d 1043, 1046-47 (9th Cir. 2005) (reaffirming the holding of *Tsai* with respect to aiders and abettors). The Rule 29 motion was properly denied.

Lopez-Martinez directs his last trial challenge to the following comments made by the prosecutor during her closing argument:

> When Agent Vasquez encountered [Lopez-Martinez] and [Miguel] . . . [Lopez-Martinez] was not worried about that group he just left in the desert. And he wasn't showing it. He didn't try to tell Agent Vasquez: I'm with a group of 20, and there's a bunch of my fellow countrymen back in the desert with a woman who died. . . . Why didn't he just say: I left to get water. Thank God you are here. Because he has a guilty conscience, that's why . . . he didn't want to get caught for bringing those people in and leaving a woman who is dead in the desert.

Lopez-Martinez did not object to this statement at the time, however, and it was not plain error to allow it. *See United States v. Whitehead*, 200 F.3d 634 (9th Cir. 2000).

**[11]** When Agent Vasquez first discovered Lopez-Martinez and Miguel hiding behind the gas station, after introducing himself and inquiring if they were okay, he asked where they were from and whether they had left anyone behind in the

desert. Lopez-Martinez said "no," no one else was with them. Lopez-Martinez portrays the prosecutor's reference to this exchange as an infringement of his Fifth Amendment right to remain silent, but this argument overlooks a key point: Lopez-Martinez did not invoke his Fifth Amendment right to remain silent; rather, he affirmatively misstated to Agent Vasquez that no one else was with him and Miguel and that they had not left the group alone in the desert. To be sure, the Fifth Amendment protects a person's right to remain silent in the face of custodial questioning by the government, but if one chooses to answer the government's questions, nothing in the Fifth Amendment protects those answers. *See LaChance v. Erickson*, 522 U.S. 262, 265 (1998) ("Our legal system provides methods for challenging the Government's right to ask questions — lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood.") (*quoting Bryson v. United States*, 396 U.S. 64, 72 (1969)).

**[12]** Notably, Lopez-Martinez does not argue that Agent Vasquez's questioning that led to this admission violated *Miranda*. Instead, Lopez-Martinez contends that the prosecutor's statement broadly encompassed not only his pre-custodial denial, but also his later, post-*Miranda* silence. Such a reference, however, cannot be divined from a fair reading of the transcript. The remark at issue was cabined to Lopez-Martinez's unequivocal denial that he had left anybody in the desert and his failure to immediately alert Agent Vasquez that the others might need help. The argument did not indict him for any later silence. As such, it was not plain error for the court to allow the prosecutor's remarks.

## B.  POST-TRIAL

By far the most troubling aspect of this case arose only once the trial had concluded. After the jury was dismissed, members of the judge's staff found an envelope while they

were cleaning up the jury room. The envelope was unsealed, and a piece of paper containing definitions of "reasonable doubt" and "conspiracy" was sitting on top of it. There was a "squiggle" on the envelope that the court believed might say "Ellis, number 37." The envelope and the piece of paper had not been provided to the jury by the court. The court disclosed the discovery to counsel the same day. Six days later Lopez-Martinez's counsel moved for a new trial.

The district court held an evidentiary hearing, at which it questioned all of the jurors regarding the document.[3] At that hearing, Juror Number 37, who had been an alternate juror and was dismissed before deliberations began, stated that he created the document based on his own internet research, and that he brought it into the jury room on the day the jury began its deliberations. The juror explained that he crafted the document for his own edification and to be as prepared as possible, and that he did not think he was violating "the spirit" of the judge's admonition against outside research. Juror Number 37 further stated that he never opened the sealed envelope, and never discussed the envelope or its contents with the other jurors. The other jurors all testified that they had never seen the document. After the hearing, the district judge denied Lopez-Martinez's motion, finding that the jurors were "individually and collectively credible," and that "a new trial [was] unnecessary because not a single juror participating in the deliberations was even aware of the extrinsic information."

While the presence of this extrinsic evidence in the jury room during deliberations is very unusual, this circumstance does not warrant a new trial. We review de novo the denial of Lopez-Martinez's motion for a new trial, but review for clear error the trial judge's underlying factual findings.[4] "Be-

---

[3]We reject Lopez-Martinez's argument that the district court's decision to hold an evidentiary hearing was error. That Lopez-Martinez would prefer the court to make the decision in a vacuum, without the benefit of evaluating what actually happened, makes little common sense.

[4]While the denial of a motion for a new trial is typically reviewed for abuse of discretion, where the motion is based on juror misconduct — as

cause of the trial judge's unique opportunity to observe the jurors during trial, to hear the defenses asserted, and to hear the evidence, the judge's conclusion about the effect of the alleged misconduct deserves substantial weight." *United States v. Saya*, 247 F.3d 929, 937 (9th Cir. 2001) (internal quotations omitted).

**[13]** The benchmark for a new trial when the jury obtains or uses evidence that has not been introduced during trial is if there is a reasonable possibility that the extrinsic material "*could* have affected the verdict." *Saya*, 247 F.3d at 937 (internal quotations omitted). The threshold question we must address, then, is a factual one: whether the jury obtained or used evidence that was not introduced at the trial. If, as the deliberating jurors all testified, none of them even saw the paper with the alternative jury instructions on it, it is logically impossible that this extrinsic evidence affected their verdict. The trial judge, after holding an evidentiary hearing, determined that "not a single juror participating in the deliberations was even aware of the extrinsic information." This finding was not clearly erroneous.

Ten of the twelve jurors stated unequivocally that they did not recall ever having seen the document in the jury room, and that they had no memory of any of the other jurors looking at it. With another juror, Juror Number 15, the judge had the following exchange:

> THE COURT: Okay. Now, do you ever recall seeing that [document] in the jury room?

> JUROR NO. 15: I — I think I — I remember reading them, but I don't remember this particular page.

this one was — our review is *de novo. See United States v. Saya*, 247 F.3d 929, 937 (9th Cir. 2001).

THE COURT: Okay. Now, remember — now, remember, I gave you a set of jury instructions. Do you remember that? A thick set?

JUROR NO. 15: (Nodding).

THE COURT: Now, this is — this is something else. This was found in the jury room, was not given to you.

So, the question is: Do you recall seeing that document in the jury room?

JUROR NO. 15: No.

THE COURT: Okay. And did you ever observe anyone else to have looked at that particular document?

JUROR NO. 15: No, I didn't.

Similarly, with Juror Number 20:

THE COURT: Okay. Now, do you recall seeing those particular documents [the envelope and the piece of paper] in the jury room?

JUROR NO. 20: Yes.

THE COURT: Okay. Now, are those different from the instructions that I gave you?

JUROR NO. 20: No, I don't think so.

THE COURT: Okay. Now, before I ask you how — how you saw them, do you recall when you left the jury — for your deliberations, I gave you a very thick set of jury instructions, is that correct?

[JUROR NO. 20]⁵: Yes.

THE COURT: And those are different from the set of jury instructions I gave you. Do you understand that?

JUROR NO. 20: In the fact that there's not so many, you're saying.

THE COURT: The fact that those were by themself. They were not part of the packet. They were brought in in a separate envelope.

Have you ever seen that separate envelope or seen that particular jury instruction in the jury room, to the best of your knowledge?

JUROR NO. 20: I don't remember.

THE COURT: Okay. Now, did you ever observe — did you ever observe anyone else looking at those two — at that document there?

JUROR NO. 20: No.

THE COURT: Okay. Now, you recall that my jury instructions were in a thick packet, they were all black and white copies, correct?

JUROR NO. 20: Correct.

THE COURT: And you'll notice on page 2 of that there's a colored portion on the bottom, is that right?

[The court, at this points, realizes the juror is look-

---

⁵The transcript erroneously says "THE DEFENDANT."

ing at a black and white photocopy, and instead gives the juror the colored original.]

THE COURT: Do you ever recall seeing that document with the colored portion in the jury room?

JUROR NO. 20: I don't believe so.

**[14]** As the transcript reflects, these jurors confused the paper that Juror Number 37 brought in with him, and which they were being shown by the court, with the packet of jury instructions provided to them by the court during deliberations. Once the court clarified that the piece of paper was not part of that packet, both jurors testified that they did not remember having seen it or seeing other jurors looking at it. From this testimony, the trial judge reasonably found that "[n]ot a single juror recalled seeing the extraneous information before the evidentiary hearing." We see no basis to disagree with the trial judge's finding that the jurors were credible.

**[15]** Lopez-Martinez correctly points out that this sequence leaves unexplained exactly how the envelope containing the alternate definitions came to be opened and by whom. As much as it would be gratifying to know the who, what, when, where, and why of how the envelope got opened, in the face of the judge's factual findings, it simply does not matter. However the envelope got opened, given that none of the jurors can even remember having seen the document, there is no way it could have affected their deliberations. Lopez-Martinez's motion for a new trial was, therefore, properly denied.

## C. SENTENCING

**[16]** Lopez-Martinez also appeals his sentence, arguing that the judge failed to properly consider the need to promote respect of law, justice, deterrence, and the protection of the

public. Because the record reflects that the judge properly considered all of the § 3553(a) factors and Lopez-Martinez's sentence was within the Guidelines range, we reject this argument and affirm Lopez-Martinez's sentence. *See* 18 U.S.C. § 3553(a); *United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008) (en banc) ("A within-Guidelines sentence ordinarily needs little explanation . . . .").

   AFFIRMED.