**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

BENJAMIN QUINN MCCHESNEY,
*Defendant-Appellant.*

No. 16-30052

D.C. No.
1:12-cr-00066-
SPW-1

OPINION

Appeal from the United States District Court
for the District of Montana
Wm. Fremming Nielsen, Senior District Judge, Presiding

Argued and Submitted June 8, 2017
Seattle, Washington

Filed September 11, 2017

Before:  M. Margaret McKeown, Consuelo M. Callahan,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Criminal Law

The panel affirmed the district court's denial, after an evidentiary hearing on remand, of the defendant's motion for a new trial on the basis of improper contact with the jury.

The defendant asserted that his ex-girlfriend had made derogatory comments about him to the jurors at his trial. The panel held that the district court did not clearly err in finding that there was no credible evidence that the ex-girlfriend ever made statements to a juror, and substantial evidence supported the district court's determination regarding the credibility of witnesses who testified at the evidentiary hearing.

The panel held that the district court did not abuse its discretion by refusing to recall the jury for live questioning, by preventing the defendant from contacting the jurors himself, or by relying on a court-drafted questionnaire that was sent to each juror. The district court also did not abuse its discretion by refusing to recuse itself for bias or a lack of impartiality, and there was no denial of due process in the defendant's exclusion from pre-hearing telephonic conferences.

The panel held that the defendant forfeited the right to challenge the destruction of courthouse surveillance videos that could have supported his allegations of improper juror

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

contact because he did not raise this issue in his briefing in his first appeal. Even without forfeiture, this claim failed because the defendant did not show bad faith.

## COUNSEL

Daniel O. C. Ball (argued), Hendrickson Law Firm P.C., Billings, Montana, for Defendant-Appellant.

Leif Johnson (argued), Acting United States Attorney, United States Attorney's Office, Billings, Montana, for Plaintiff-Appellee.

## OPINION

McKEOWN, Circuit Judge:

We are faced with a peculiar case of "he said, she said." After Benjamin McChesney was convicted of orchestrating a massive gun heist, he claimed his ex-girlfriend had said nasty things about him to the jurors at his trial. None of the jurors reported this improper contact, nor did the court security officers who would have apparently been within earshot. The district court did not buy McChesney's story and denied his motion for a new trial. After a different panel of our court remanded to the district court to dig a little deeper with an evidentiary hearing, the court denied McChesney's motion for a second time, this time finding "no credible evidence" that jurors heard any derogatory comments. In his second appeal, McChesney again appeals the denial of his motion for a new trial. We affirm the district court's denial of that motion. McChesney did not carry his

burden to offer any credible evidence to establish outside contact with a juror.

## BACKGROUND

A jury convicted McChesney on charges of theft and possession of stolen firearms. He promptly moved for a new trial and claimed that the jurors had overheard his ex-girlfriend, Krista McFarren, make derogatory comments about his "criminal past, bad character, and his willingness to do anything for money." *United States v. McChesney*, 613 F. App'x 556, 560 (9th Cir. 2015). Due to these stray remarks, McChesney demanded a do-over.

To support his motion for a new trial, McChesney submitted an affidavit from his co-defendant's mother, Julie Lennick. Lennick swore she heard McFarren's "loud" outburst in front of "[a]t least three jurors" as she was turning in her visitor badge in the courthouse lobby. Perhaps sensing that the word of his co-defendant's mother might be taken with a pinch of salt, McChesney also filed a request for courthouse surveillance videos that he said might have captured McFarren's diatribe on film. The district court denied the motion for a new trial and never ruled on the request for the videos.

Not quite satisfied with the procedures in the district court, we vacated the judgment and remanded for an evidentiary hearing. Although we acknowledged that "[t]here may well be good reasons to doubt [Lennick's] credibility," we concluded that the district court "should have held an evidentiary hearing to determine whether the alleged statements were made, and if so, whether they were heard by jurors and there is a reasonable possibility they affected the verdicts." *Id.* at 561.

On remand, the district court held three telephonic conferences in the run-up to the evidentiary hearing. McChesney was not on the line for any of these calls, but his counsel was. The first two were brief and mundane. During a call in June 2015, the parties addressed the nuts and bolts of the upcoming hearing, such as where and when it would occur and which witnesses might testify. The court then held a call in September 2015 to discuss rescheduling the evidentiary hearing and setting a schedule to brief the question of McChesney contacting jurors to investigate his allegations. Prior to this call, McChesney's counsel filed a motion requesting that the court hold a telephonic conference and requested that McChesney participate in the conference because it would be a "crucial stage" of the proceedings. It appears McChesney's request to participate in the call was denied. The court held a third call in October 2015 concerning a proposed questionnaire to ask the jurors if anyone heard McFarren's comments. On this call, McChesney's counsel again advised that his client wished to be included "on any and all conference calls" and expressed concern that the call "may be a critical stage." The court disagreed with this characterization because the call merely involved "setting up the procedure" to contact the jurors, and the court also noted that McChesney was represented by counsel on the call and could submit written objections to the procedure. McChesney submitted his written objections through counsel two days later. The court then sent the questionnaire to the jurors.

Within a few weeks of the third call, McChesney filed a motion to disqualify the district court. McChesney alleged that the court was biased against him and had "conducted fact-finding as to disputed facts" by talking with court staff before resolving his motion for a new trial the first time around. The court denied the motion, disavowing the

claimed bias and any improper investigation of McChesney's claims.

With the path now clear to resume, the district court held an evidentiary hearing in December 2015. Five witnesses testified. First up was Lennick, who said she was "small-talking" with a juror after leaving the courtroom at lunchtime during McChesney's trial. According to Lennick, while she and the juror "were talking in front of the elevator and riding down," McFarren "started talking about how [McChesney] was a piece of shit and he deserved to go to prison." This tirade apparently continued when everyone left the elevator and stopped in the lobby to return their visitor badges. Lennick claimed McFarren was talking "the whole time" and was "really boisterous and loud" when everyone waited in line to return their badges. "[E]verybody heard it," she said, including "the guys that were checking us out at the front door." Lennick also swore she reported everything to David Merchant, the Assistant Federal Defender who had represented her son during the trial.

Next to testify was Lennick's daughter, Tana Romero, who said she was with Lennick and the juror when McFarren began yelling her disparaging remarks. Romero recalled that the remarks happened "[a]ll the way down" and "all of the way out of the elevator" and continued as she left the courthouse after returning her badge. Although Romero initially testified that the remarks were "loud," she offered contradictory testimony about whether the statements—loud or otherwise—were confined to the elevator or continued in lobby. Both Lennick and Romero agreed that jurors routinely rode in the public elevator and mingled with the public during breaks at trial, all outside the presence of court staff.

The stories told by Lennick and Romero did not align with the protocols described by court staff. Heather McLean, the court's jury coordinator, testified that none of the jurors reported extrinsic contact during McChesney's trial, despite instructions to alert court staff immediately "if anybody approaches them or [] tries to strike up a conversation." McLean also explained that the jury coordinator does a head count before anyone leaves the jury room and that the jurors cannot mingle with the public and must stick together when entering the lobby or riding the elevator. "[W]e kind of travel like a kindergarten group, short of the rope," she quipped.

Roxanne Bauer, the lead court security officer, corroborated McLean's testimony. She testified that the officers on duty during McChesney's trial would have overheard and reported any loud outbursts but that no officer remembered hearing anything and no report was made. And the final—and key—witness, David Merchant, directly contradicted Lennick's testimony that she alerted him to McFarren's tirade. He swore that Lennick never mentioned contact between jurors and McFarren or any instances of jurors riding the elevator with witnesses. When McChesney's counsel asked Merchant on cross-examination why he had never investigated the allegations of improper juror contact, he replied simply: "I don't believe it happened."

The district court denied McChesney's motion for a new trial, finding that there was "no credible evidence" McFarren ever made statements to any juror. In the court's view, Lennick and Romero were "not credible for several reasons." Their stories diverged on material issues, and neither Lennick's nor Romero's "version of events comport[ed] with courthouse policy," as "very credibl[y]"

and "knowledgeabl[y]" described by McLean and Bauer. To cap things off, Merchant had "very credibl[y]" contradicted Lennick's testimony that they had spoken about McFarren interacting with a juror. The court also found that the "familial relationship" between McChesney's co-defendant and Lennick and Romero cast "doubt on their credibility" and suggested "bias may have colored their testimony" because they had "a clear interest in the possibility of a new trial" for McChesney and his co-defendant. Finally, the court noted that every juror except one alternate had responded to the court's questionnaire and sworn "under penalty of perjury" that none of the jurors had heard "any inappropriate comments during their jury service." Because the court found "there [was] no credible evidence any statements were made," it declined to reach the question of possible juror prejudice.

## ANALYSIS

At its core, McChesney's appeal challenges the district court's decision to deny him a new trial based on his claims of improper contact with the jury. His other arguments on appeal all relate to how the district court reached that decision and whether the court's procedures were improper. To frame these issues, we begin with the main act: the district court's refusal to grant McChesney a new trial.

### I.  Contact with the Jury

Although we review de novo the denial of a motion for a new trial based on allegations of improper juror contact, the district court's underlying factual findings are reviewed for clear error. *United States v. Lopez-Martinez*, 543 F.3d 509,

517 & n.4 (9th Cir. 2008).[1]   McChesney bears the initial burden of producing credible evidence to support his bare assertion that McFarren made improper statements to a juror. *See Godoy v. Spearman*, 861 F.3d 956, 967–68 (9th Cir. 2017) (en banc) ("The defendant must present evidence of a contact sufficiently improper as to raise a credible risk of affecting the outcome of the case."); *Tarango v. McDaniel*, 837 F.3d 936, 947 (9th Cir. 2016) (explaining that "[t]hreadbare or speculative allegations" will not do the trick).   After the district court considered all the evidence following the evidentiary hearing, it found there was "no credible evidence" that McFarren ever made statements to a juror.   This finding was not clearly erroneous.

Substantial evidence supported the district court's credibility determination.   The government's witnesses cast doubt on the truth of Lennick's and Romero's stories. "[V]ery credible" testimony from McLean and Bauer disputed the idea that stray jurors freely roamed the hallways, hobnobbing with trial witnesses and spectators in the elevator and lobby.   None of the court security officers on duty reported any disruption, despite Lennick's and Romero's claims that McFarren aired her grievances about McChesney in the crowded area beside the security checkpoint.   McLean also testified that the jurors were required to keep their badges throughout the trial and would not have been "returning" them in the lobby as Lennick and

---

[1] The government asserts that the denial of McChesney's motion for a new trial is reviewed for abuse of discretion.   While that is typically the standard for this kind of motion, review is de novo when the claim involves allegations of juror exposure to extrinsic evidence. *Lopez-Martinez*, 543 F.3d at 517 & n.4; *United States v. Saya*, 247 F.3d 929, 937 (9th Cir. 2001).

Romero described.[2]   Lastly, Merchant explicitly rejected Lennick's testimony that she told him all about McFarren's outburst in a juror's presence.

To make matters worse, Lennick and Romero offered somewhat inconsistent accounts of what allegedly occurred. For example, Lennick described McFarren as "really boisterous and loud" in the lobby, whereas Romeo testified that McFarren spoke "in a normal conversational tone" after exiting the elevator.  The court's adverse credibility finding against Lennick was also supported by other features of her testimony, such as her inability to identify the juror with any specificity despite her claims that she had observed him closely throughout the trial.  Although there may be a plausible explanation for some of these inconsistencies, alternative theories do not render the district court's factual findings clearly erroneous.  McChesney "has simply failed to establish that any contact has occurred, much less that any juror[] contact resulted in actual prejudice." *See United States v. English*, 92 F.3d 909, 914 n.6 (9th Cir. 1996); *see also United States v. Harber*, 53 F.3d 236, 242–43 (9th Cir. 1995).

McChesney did not carry his initial burden of supporting his allegations with credible evidence.  The district court's factual findings were not clearly erroneous and its denial of the motion for a new trial was not in error.

---

**2** Although McLean was not the jury clerk at the time of the alleged statements, the district court did not err by crediting her testimony about general courthouse procedures of which she was "thoroughly knowledgeable."

## II.  Questionnaire for the Jurors

McChesney faults the district court for blocking his attempts to communicate with the jurors before the evidentiary hearing.  He essentially argues that the court abused its discretion by refusing to recall the jury for live questioning, by preventing him from contacting the jurors himself, and by relying on a court-drafted questionnaire that was sent to each juror. *See United States v. Montes*, 628 F.3d 1183, 1187 (9th Cir. 2011) (reviewing decision not to take live testimony from jurors for abuse of discretion).

Although it is sometimes necessary or prudent to recall or question jurors when investigating allegations of improper contact, it is not always required.  *Montes*, 628 F.3d at 1188.  Rather, district courts have the "discretion . . . to preclude live juror testimony" in certain circumstances. *Id.*  Here, the district court declined to solicit live testimony because "no credible evidence" supported McChesney's allegations.  Given the lack of evidentiary foundation that any contact even occurred, it was not an abuse of discretion to refuse McChesney's request to haul in the jurors years after the trial had ended.  Nor was it an abuse of discretion to preclude McChesney from contacting the jurors directly; as the district court said, such an "interfere[nce] in the personal lives of the jurors would be invasive and possibly intimidating."  To alleviate these legitimate concerns, the court used the questionnaire as a compromise approach "to reconcile the need to investigate the claims . . . without unduly imposing on the jurors."  Although the actual jurors were never cross-examined, their unanimous response to the questionnaire was to swear "under penalty of perjury" that they had not heard McFarren's derogatory comments.  (Only an alternate juror

did not return the form.)  This response was in accord with the other evidence before the district court.

McChesney's objections to the questionnaire itself are also without merit.  He bemoans the ease with which a juror could reply untruthfully, but that concern was mitigated by the court's requirement that the juror declare "under penalty of perjury" that the answer was "true and correct."  He also claims that the questionnaire inquired only about comments made at a specific time on a specific date—lunchtime on July 10, 2013—when in fact the jurors might have been "contacted improperly on July 11."  Even setting aside that the genesis of this specific time and date was Lennick's affidavit, McChesney's premise is false because the questionnaire inquired about comments made "on *or about* July 10."  It is far-fetched to suggest that jurors would neglect to tell the court about McFarren's comments because of a timing technicality regarding events that happened so many years ago.

Under the circumstances, the district court's method of balancing the competing interests was not "illogical," nor did it "exceed the permissible bounds of its discretion."  *See Montes*, 628 F.3d at 1187, 1189.  There will be cases where live juror testimony is essential to investigating allegations of improper contact, but this is not one of them.

### III. Recusal of the District Court

McChesney asked the district court to recuse itself under 28 U.S.C. § 455(a) and (b) due to alleged bias and a lack of impartiality.  "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and "expressions of impatience, dissatisfaction, annoyance, and even anger" alone are insufficient to establish "bias or

partiality." *Liteky v. United States*, 510 U.S. 540, 555–56 (1994).

McChesney argues that the district court's legal rulings reveal bias and partiality. That allegation is hard to swallow after reviewing the record. Nothing in the court's rulings suggests any partiality and certainly nothing "display[ed] a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555. Although the district court at times showed some wry impatience at McChesney's requests, jocular comments are no basis for recusal. *Id.* at 555–56.

McChesney also impugns the district court's impartiality by alleging that the court "conducted fact-finding" on its own, speaking with court security officers about "disputed evidentiary facts" related to the purported juror contacts. The basis for this allegation is unclear but seems related to our disposition in McChesney's first appeal, in which we noted that the "factual basis" for the district court's original assertion that officers would have heard and reported McFarren's outburst was neither "self-evident" nor "in the record." *McChesney*, 613 F. App'x at 561. The same cannot be said today. Bauer testified at the evidentiary hearing that no officers had spoken with the court about this issue, and the court itself asserted that the earlier "observations were based on [] experience entering and exiting the building and general experience as a judicial officer."

In the face of McChesney's speculative accusation, the court did not abuse its discretion by denying the recusal motion. *See United States v. Studley*, 783 F.2d 934, 939 (9th Cir. 1986) (reviewing for abuse of discretion the denial of a motion to disqualify).

## IV. Exclusion from the Telephonic Conferences

Under the Fifth Amendment's Due Process Clause, a defendant has "the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *See Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).**[3]** McChesney argues the three pre-hearing telephonic conferences were "critical stage" proceedings that he had a right to attend. We review these claims de novo and for harmlessness. *United States v. Rosales-Rodriguez*, 289 F.3d 1106, 1109–10 (9th Cir. 2002).

"A critical stage is any 'stage of a criminal proceeding where substantial rights of a criminal accused may be affected.'" *Hovey v. Ayers*, 458 F.3d 892, 901 (9th Cir. 2006) (quoting *Mempa v. Rhay*, 389 U.S. 128, 134 (1967)). In determining whether a proceeding qualifies as a "critical stage," we consider three factors: (1) whether "failure to pursue strategies or remedies results in a loss of significant rights," (2) whether "skilled counsel would be useful in helping the accused understand the legal confrontation," and (3) whether "the proceeding tests the merits of the accused's case." *Id.* at 901 (quoting *Menefield v. Borg*, 881 F.2d 696, 698–99 (9th Cir. 1989)). Because McChesney was represented by counsel and no confrontation occurred on the calls, only the first and third factors could be relevant here. *See United States v. Benford*, 574 F.3d 1228, 1233 (9th Cir. 2009).

---

**[3]** McChesney asserts rights under both the Fifth and Sixth Amendments, but his claim properly sounds in due process—and not the Sixth Amendment—because the telephonic conferences did not involve "confront[ation] with the witnesses against him" and he was not denied "the assistance of counsel." *See* U.S. Const. amend. VI.

The first two calls dealt with preliminary scheduling and procedural issues related to the evidentiary hearing and were of an administrative nature where McChesney's presence was not required. The calls could not have affected McChesney's substantial rights, so neither was a "critical stage." *See Hovey*, 458 F.3d at 901; *see also Benford*, 574 F.3d at 1232–33 (holding that the pretrial status conference in that case was not a "critical stage" because "[n]othing significant occurred," "there was no 'loss of significant rights,'" and it "plainly did not 'test[] the merits of the accused's case'").

The third phone conference presents a closer call. The court and the parties were discussing the juror questionnaire—a questionnaire that in some sense implicated McChesney's "significant rights" but did not test the "merits" of his motion for a new trial. *See Hovey*, 458 F.3d at 901. However, even if we assume this call did qualify as a "critical stage," McChesney would have no right to attend unless "his presence would contribute to the fairness of the procedure." *See Stincer*, 482 U.S. at 745. McChesney was represented by counsel during the call and had the opportunity to submit written objections to any of the procedures discussed by the parties and the court. Indeed, during the call itself, counsel said he would submit written objections and previewed what those objections would be. The written objections filed two days later largely mirrored the oral objections announced during the call. Although not persuaded, the district court considered the objections and the alternative approaches outlined in the written objections. Nothing in the record suggests that McChesney's presence on the line during the call itself would have contributed in any way to the proceeding's fairness, and so no due process violation occurred. For similar reasons, even if an error had occurred, any error in

excluding McChesney was harmless. *See Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005) (en banc).

## V.  Preservation of the Surveillance Videos

McChesney's final argument concerns the destruction of courthouse surveillance videos that he says could have supported his allegations of improper juror contact. He first requested these videos after he filed his first motion for a new trial. The district court never ruled on his request and McChesney never followed up with the court, nor did he raise the issue in his first appeal.[4] By the time the case returned to the district court two years later for the evidentiary hearing, the videos had been destroyed in the ordinary course of courthouse business. Bauer confirmed at the hearing that no surveillance remained from McChesney's trial and that these videos generally were discarded every two months.

McChesney argues that reversal is necessary because the court and the government failed to preserve the videos. Although he dubs this a "*Brady* challenge" because he says the videos "could include *Brady* material," *see Brady v. Maryland*, 373 U.S. 83, 87 (1963), the label is not what matters. His claim is essentially that the destruction of potentially useful evidence violated his right to due

---

[4] Although the district court never used the word "denied" with respect to McChesney's motion under Fed. R. Crim. P. 17(b) to obtain the videos, the district court's initial order denying McChesney's motion for a new trial addressed the Rule 17(b) motion and provided reasons that supported denial. Specifically, the district court noted that Lennick's affidavit alleged that McFarren's comments were made in the lobby, but the videos requested were of the fifth floor. Because McChesney did not raise this issue in his first appeal, we do not address whether the district court was required to deny the motion expressly.

process—a claim we review de novo.  *See United States v. Ross*, 372 F.3d 1097, 1107 (9th Cir. 2004).

McChesney forfeited any right to challenge the destruction of the videos because his briefing in the first appeal never mentioned the district court's failure to rule on his request to provide them.  *See Tibble v. Edison Int'l*, 843 F.3d 1187, 1196 (9th Cir. 2016) (en banc).  Even without forfeiture, his claim fails because "[t]here is no principled reason" why he should avoid having to show bad faith.[5]  *See United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993); *see Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

Not only does McChesney fail to allege bad faith, he explicitly disavows "any allegation of prosecutorial misconduct."  Nothing in the record betrays any shenanigans by the prosecutor or the court.  To the contrary, the only evidence concerning the fate of the videos is Bauer's testimony that surveillance footage was routinely discarded as part of the court's ordinary practice.  The government's compliance with regular procedures "should be regarded as an indication that the disposal of evidence was not performed in 'bad faith.'"  *United States v. Heffington*,

---

[5] Because McChesney's claim fails under *Youngblood*'s bad faith standard, we need not and do not decide whether McChesney would have a cognizable due process claim even if the government acted in bad faith.

952 F.2d 275, 281 (9th Cir. 1991).  McChesney's claim must fail.

   **AFFIRMED.**